## THE STATE v. BOCKSTRUCK, *Appellant.*

### Division Two, December 15, 1896.

1. **Criminal Law**: SALE OF IMITATION BUTTER: PRINCIPAL AND AGENT: SALE BY CLERK. A sale of imitation butter by a clerk in defendant's store, apparently made in the ordinary course of business, is *prima facie* evidence of a sale by defendant; if the sale was made against defendant's order, it devolved upon him to show it as a matter of defense.

2. ————: ————: INFORMATION: EVIDENCE. In a prosecution under section 2 of the act of 1895 (Laws 1895, p. 26), prohibiting the manufacture and sale of any substitute for butter in which is used any annato or compound of the same, or any other substance or substances for the purpose of imparting a yellow color thereto, it was competent for the information to allege that the substitute sold was composed of animal fat and vegetable oils, etc., combined with other substances to the informant unknown, for the purpose, and with the effect of imparting thereto a yellow color, and in such case it was not necessary to prove what substance was used to give to the substitute its yellow color.

| | |
|---|---|
| 136 | 335 |
| 139 | 537 |
| 140 | 287 |
| 136 | 335 |
| 143 | 247 |
| 144 | 665 |
| 136 | 335 |
| 145 | 587 |
| d80a | 356 |
| 136 | 335 |
| f155 | 504 |
| 136 | 335 |
| 160 | 70 |
| 160 | 492 |
| 136 | 335 |
| 90a | 165 |
| 136 | 335 |
| j168¹²| 206 |
| j168¹²| 209 |
| j168 ⁷| 213 |
| 136 | 335 |
| 170 | ⁵106 |
| 170 | ⁷114 |
| 170 | ¹²318 |
| 171 | ⁵644 |
| 136 | 335 |
| e178 ³| 42 |

State v. Bockstruck.

3. ———: STATUTORY OFFENSE: PROVISO: PLEADING. Where an affirmative offense is created by a statute without reference to a proviso or exception contained therein, such proviso or exception need not be negatived in the indictment or information charging it, and this is true whether the proviso be in the same section or a subsequent section of the same act which creates another and distinct offense.

4. ——— : ——— : ——— : ——— : SALE OF IMITATION BUTTER. An indictment for selling a substitute for butter, colored in imitation of yellow butter, contrary to the provisions of the act of April 19, 1895 (Laws 1895, p. 26, sec. 2), need not negative a proviso in the same section permitting the coloring of such substitute manufactured for sale outside of this state.

5. Statute: TITLE. It is only necessary for the title to an act to indicate the subject of it in a general way without entering into details, and all auxiliary provisions properly attaching to the main subject, and constituting with it one whole, may be embraced within the enactment.

6. ———: ———: SALE OF IMITATION BUTTER. The act of April 19, 1895 (Laws 1895, p. 26), entitled, "an act prohibiting the coloring yellow of any substance designed to be used as a substitute for butter, to prohibit the manufacture, sale, keeping for sale, and fraudulent use of substances designed as imitation butter; to regulate the manufacture, sale, and keeping for sale of any substance designed to be used as a substitute for butter," sufficiently expresses in the title the subject of the act, so as to include section 5 thereof, requiring such substitutes to be marked in a certain manner, and providing that persons having them in their possession unmarked will be presumed to have known their character. Const., art. 4, sec. 28.

7. ———: ———: CONSTITUTION. A part of a law may be constitutionally invalid and the remainder of it valid, where the objectionable part may be properly separated from the other, and this is so although the valid and the invalid may be contained in the same section.

8. Criminal Law: SALE OF IMITATION BUTTER: CONSTITUTIONALITY OF STATUTE. One convicted under section 2 of the act of April 19, 1895 (Laws 1895, p. 26), of selling a substitute for butter, colored yellow, contrary to the provisions of said section, will not be heard to complain that section 5 of the same act, requiring imitation butter to be marked in a certain manner, is unconstitutional.

9. ———: ———: ———. Section 8 of the act of April 19, 1895 (Laws 1895, p. 26), providing that whoever shall have possession or control of any imitation butter, or any substance designed to be used as a substitute for butter, contrary to the provisions of the act, shall be construed to have possession of property with intent to use it as a

State v. Bockstruck.

means of committing a public offense, is not in violation of section 53 of article 4 of the constitution, declaring that the general assembly shall not pass any special law "changing the rules of evidence in any judicial proceedings or inquiry before courts."

10. ——: ——: ——: POLICE POWER. The act of April 19, 1895 (Laws 1895, p. 26), prohibiting the manufacture and sale of substances in imitation of butter, is within the police power of the state, and is constitutional.

11. ——: MISDEMEANOR: WAIVER OF JURY TRIAL. One prosecuted for a misdemeanor may waive his right to a trial by jury and submit his case to a trial by the court, whose finding will have the force and effect of a verdict of a jury.

12. Constitutional Law: JURY TRIAL. The constitutional guaranty of "the right of trial by jury as heretofore enjoyed" has reference to the status of that right as it existed at the time of the adoption of the constitution.

13. Criminal Law: SALE OF IMITATION BUTTER: FIRST AND SECOND OFFENSES: PUNISHMENT: CONSTITUTION. One convicted of a first offense under the provisions of section two of the act of April 19, 1895 (Laws 1895, p. 26), prohibiting the manufacture and sale of imitation butter, can not be heard to complain of the unconstitutionality of another section of the same act providing for the punishment of each subsequent offense, the provisions of the act with reference to the punishment of first and subsequent offenses being readily separable.

14. ——: MISDEMEANOR: JUDGMENT, MODIFICATION OF IN APPELLATE COURT. It is not necessary for a judgment in a misdemeanor case to specify the purpose to which the fine imposed shall be applied, it being the duty of the proper officer to dispose of it as the law directs, and a judgment directing a particular disposition of the fine in such case may be amended in the appellate court by striking out the unnecessary words.

*Appeal from St. Louis Court of Criminal Correction.*
HON. DAVID MURPHY, Judge.

AFFIRMED.

THIS prosecution is based on an act of the legislature approved April 22, 1895, and found in the laws of Missouri of that year, pages 26 *et seq.*, which act will be presently quoted.

VOL. 136 mo—22

The amended information on which defendant was prosecuted, is the following:   It charged that he, "on the thirty-first day of July, 1895, did unlawfully sell, keep for sale and offer for sale a certain imitation of butter, to wit, a substance which was then and there composed of animal fat, vegetable oil and other substances compounded with butter, and also compounded with other substances which are to the informant unknown, for the purpose and with the effect of imparting thereto a yellow color and a shade of yellow, so that the same then and there resembled and was in imitation of genuine yellow butter," etc.

The statute to which reference has been made is as follows:

"An act prohibiting the coloring yellow of any substance designed to be used as a substitute for butter; to prohibit the manufacture, sale, keeping for sale and fraudulent use of substances designed as imitation butter; to regulate the manufacture, sale and keeping for sale of any substance designed to be used as a substitute for butter, and making an appropriation for carrying out the provisions of this act.

"Be it enacted by the General Assembly of the State of Missouri, as follows:

"Section 1.   That for the purpose of this act, every article, substitute or compound, other than that produced from pure milk, or cream from the same * * * used as a substitute for butter made from pure milk or cream from the same, is hereby declared to be imitation butter.

"Sec. 2.   No person shall combine any animal fat or vegetable oil or other substance with butter, or combine therewith or with animal fat or vegetable oil or combination of the two, or with either one, any other substance or substances whatever, any annatto or compound of the same, or any other substance or sub-

stances, for the purpose or with the effect of imparting thereto a yellow color, or any shade of yellow, so that such substitute shall resemble yellow or any shade of genuine yellow butter, nor introduce any such coloring matter or such substance or substances into any of the articles of which the same is composed: Provided, nothing in this act shall be construed to prohibit the use of salt and harmless coloring matter for coloring the substitutes for butter manufactured for export or sale outside the state. No person shall, by himself, his agents or employes, produce or manufacture any substance in imitation or semblance of natural butter, nor sell, nor keep for sale, nor offer for sale, any imitation butter made or manufactured, compounded or produced in violation of this section, whether such imitation butter shall be made or produced in this state or elsewhere. This section shall not be construed to prohibit the manufacture and sale, under the regulations hereinafter provided, of substances designed to be used as a substitute for butter, and not manufactured or colored as herein prohibited.

"Sec. 3. Every person who lawfully manufactures any substance designed to be used as a substitute for butter shall mark, by branding, stamping or stenciling upon the top and side of each tub, firkin, box or other package in which such article shall be kept, and in which it shall be removed from the place where it is produced, in a clean and durable manner, in the English language, the words 'Substitute for butter,' in printed letters, in plain Roman type, each of which shall not be less than one inch in length and one half inch in width.

"Sec. 4. No person, by himself or another, shall ship, consign or forward by any common carrier, whether public or private, any substance designed to be used as a substitute for butter, and no carrier shall

knowingly receive the same for the purpose of forward-
ing or transporting, unless it shall be manufactured and
marked as provided in the preceding section of this act,
and unless it be consigned by the carrier and receipted
for by its true name: Provided, that this act shall not
apply to any goods in transit between foreign states
across the state of Missouri.

"Sec. 5. No person shall have in his possession
or under his control, any substance designed to be·
used as a substitute for butter, unless the tub, firkin,
box or other package containing the same be clearly·
and durably marked, as provided by section 4 of this.
act: *Provided*, that this section shall not be deemed to·
apply to persons who have the same in their possession
for the actual consumption of themselves and family.
Every person having in possession or control of any
substance designed to be used as a substitute for·
butter, which is not marked as required by the pro-·
visions of this act, shall be presumed to have known
during the time of such possession or control, the true
character and name, as fixed by this act, of such
product.

"Sec. 6. No person, by himself or another, shall·
sell or offer for sale any substance designed to be used
for a substitute for butter under the name of or under·
the pretense that the same is butter.

"Sec. 7. Whoever shall violate any of the pro-
visions of sections 2, 3, 4, 5 or 6 of this act shall, for·
the first offense, be punished by a fine not less than
$50 nor more than $100, or by imprisonment not
exceeding thirty days, and for each subsequent offense·
by a fine of not less than $250 nor more than $500, or
by imprisonment in the county jail not less than thirty
days nor more than six months, or by both such fine
and imprisonment, in the discretion of the court.

"Sec. 8.   Whoever shall have possession or control of any imitation butter, or any substance designed to be used as a substitute for butter, contrary to the provisions of this act, shall be construed to have possession of property with intent to use it as a means of committing a public offense: Provided, that it shall be the duty of the officer who serves a search warrant issued for imitation butter, or any substance designed to be used as a substitute for butter, to deliver to the state board of agriculture, or to any person by said board authorized, in writing, to receive the same, a perfect sample of each article seized by virtue of such warrant, for the purpose of having the same analyzed, and forthwith to return to the person from whom it was taken the remainder of each article seized as aforesaid.   If any sample be found to be imitation butter, or substance designed to be used as a substitute for butter, it shall be retained by the state board of agriculture; but if any sample be found not to be imitation butter, or a substance designed to be used as a substitute for butter, it shall be returned forthwith to the person from whom it was taken.

"Sec. 9.   No action can be maintained on account of any sale or other contract made in violation of or with intent to violate this act, by or through any person who was knowingly a party to such wrongful sale or other contract.

"Sec. 10.   Whoever shall efface, erase, cancel or remove any mark provided for by this act, with intent to mislead, deceive, or to violate any of the provisions of this act, shall be deemed guilty of a misdemeanor.

"Sec. 11.   The state board of agriculture shall be and is hereby charged with the enforcement of this act.   There is hereby appropriated to the state board of agriculture, out of any money not otherwise appropriated, the sum of five thousand dollars ($5,000) for

the next biennial period, or so much thereof as may
be necessary for the enforcement of this act: Provided,
that all fines collected under the provisions of this act
shall be covered into the state treasury. Actions
under this act shall be brought in any court of competent jurisdiction.

"Sec. 12.  All acts and parts of acts inconsistent
with this act are hereby repealed."

Defendant unsuccessfully moved to quash the
information, which motion being denied, he pleaded
not guilty to the charge and waived a jury, whereupon
the cause was tried by the court upon the following
testimony:

"*Q.*  What is your full name?  *A.* David May.

"*Q.*  What official position do you hold, Mr.
May?  *A.* I am agent for the state enforcement of
this oleomargarine law, in regard to the manufacture
and sale of oleomargarine.

"*Q.*  Connected with the agricultural department
of the state?  *A.* I am acting through the state board
of agriculture.

"*Q.*  On the thirty-first day of July were you at
Mr. Henry Bockstruck's place of business?  *A.* Yes,
sir.

"*Q.*  Did you have any business transactions
there?  *A.* I purchased a pound of oleomargarine from
his place.

"*Q.*  From whom did you purchase it?  *A.* I
purchased it from a young man about sixteen years
of age.

"*Q.*  A clerk in the store?  *A.* Yes, sir.

"*Q.*  Well, what do you mean by oleomargarine,
of what is it composed?  *A.* It is composed of certain
fats and vegetable oils, and usually some coloring
matter that gives it an imitation of butter, the same
shade as yellow butter.

"*Q.* Well, with reference to this pound that you purchased there, what was the color of it? *A.* It was colored to imitate yellow butter.

"*Q.* It was colored to imitate yellow butter? *A.* Yes, sir.

"*Q.* Can you state the substance with which it was colored? *A.* It is my belief that it was annatto. I can not swear to it."

"*Counsel for defendant:* Wait a minute. I want to save the point that the information does not charge that it was annatto. (Addressing witness): You say you don't know whether it was annatto or not? *A.* I know that it was colored, but I don't know that it was annatto.

"*Q.* It was colored with some substance, as I understand you to say, Mr. May, similar to annatto? *A.* Some substance that has the same effect as annatto.

"*Q.* That is, you mean to say it gave this oleomargarine a yellow color, imitating yellow butter? *A.* Without having necessary constituents of yellow butter, it caused it to imitate yellow butter.

"*Q.* It was, in fact, oleomargarine, imitating genuine yellow butter? *A.* Yes, sir.

"*Q.* Did you make an analysis of this stuff that you bought there? *A.* Yes, sir.

"*Q.* Are you a chemist, Mr. May? *A.* Yes, sir.

"*Q.* A practical chemist; you have had some experience? *A.* Yes, sir; I graduated from the State University and I have worked a year since under the state chemist, Dr. Schweitzer.

"*Q.* That happened in this city? *A.* Yes, sir.

"*Q.* Well, you analyzed this oleomargarine or whatever you call it; you analyzed it, you made an analysis of it, did you, Mr. May? *A.* Yes, sir.

"*Q.* What did you find to be the constituent parts of this stuff that you bought from Mr. Bockstruck?

*A.* I used the government official test, just to determine the amount of soluble .fat and acids. It is impossible to tell whether it was animal fat or vegetable oil or a combination of the two, but you can determine without a possibility of a doubt that it is composed of one or two of these substances, and not genuine butter. I found it to be an oleomargarine embracing a combination, or a compound, composed of animal fat or vegetable oil, or a combination of the two.

"*Q.* What is the color of oleomargarine in its natural state? *A.* It is either the color of lard, or if it has a good deal of vegetable oil in it it is a very light straw color.

"*Q.* Was there any per cent of butter in this preparation, could you determine? *A.* Not that I was able to determine; I don't think there was any. It might have been churned with butter, with cream, I mean; doubtless was.

"*Q.* That happened in the city of St. Louis? *A.* Yes, sir.

"*Q.* In the state of Missouri? *A.* Yes, sir.

"*Q.* I understand you to say this was on the thirty-first day of July of this year? *A.* Yes, sir."

It was admitted by counsel for defendant that the above mentioned sale was made by a clerk in the store of defendant. On part of defendant no evidence was offered. No declarations of law were asked or given. At the conclusion of the evidence the court was moved for defendant's discharge because no case was made for the state thereby, which motion was ineffectual. The court then found the issue against the defendant, and in its judgment upon such, finding, set forth: "It is therefore considered by the court that the said defendant for his offense, and in pursuance of the finding of the court, as aforesaid, pay to the state of Missouri,

for the use of the city of St. Louis, a fine of fifty dollars together with the costs herein accrued," etc., etc.

Motions for new trial and in arrest being denied, defendant appealed to the St. Louis court of appeals, from whence this cause has been transferred to this court because a constitutional question is involved.

Other matters necessary to be noticed will be discussed, so far as occasion requires, in the opinion.

*Charles M. Napton* for appellant.

(1)  The information should charge and the proof show what was combined with the animal fat to give it a yellow color, and the substance should have been alleged to be either "annatto or a compound of the same." *State v. Dennisse*, 109 Mo. 438; *St. Joe v. Porter*, 29 Mo. App. 605; *State v. Gresham*, 90 Mo. 166; *State v. May*, 106 Mo. 504; *State v. Bryant*, 90 Mo. 534; *Bachman v. Brown*, 57 Mo. App. 68; *St. Louis v. Laughlin*, 49 Mo. 559; *State v. Pemberton*, 30 Mo. 376. A statute imposing a penalty for a newly created offense must be strictly construed. *Riddick v. Govern*, 1 Mo. 147.  (2) The information being drawn under section 2, it should negatively aver that the substance was not composed with "salt and harmless coloring matter for export or sale outside of the state," as required by said section 2. Section 5 of the act excepts persons who "have the same in their possession for the actual consumption of themselves and family." The information should also negative this averment. *State v. Hathaway*, 115 Mo. 325; *State v. Sparrow*, 52 Mo. App. 374; *State v. Raymond*, 54 Mo. App. 425. (3) Section 11 of the act provides that "all fines collected under the provisions of this act shall be covered into the state treasury." This violates article 11, section 8, of the constitution, which directs that all fines for violation of

the penal laws shall go to the county school fund of the county where imposed. *Barnett v. Railroad*, 68 Mo. 56; *Blewett v. Smith*, 74 Mo. 406; *State v. Railroad*, 89 Mo. 562; *Emerson v. Railroad*, 111 Mo. 161. This fine can't go to the city of St. Louis, as such a disposition is contrary to the act itself, and it can't go to the state, as the constitution prohibits it. Therefore, the judgment imposing the fine "to be paid to the state for the use of the city of St. Louis" must be reversed. But section 7 of the act imposes an alternative penalty— either fine or imprisonment, or both. The fine being illegal, I hold that this should necessarily destroy all penalty whatever. (4) Section 7 violates section 22 of the bill of rights, which is that in criminal prosecutions the accused shall have the right to "a speedy public trial by an impartial jury of the county;" and of section 28 of the same—"the right of trial by jury, as heretofore enjoyed, shall remain inviolate." This act takes away from the jury all control over the punishment, and leaves it entirely "in the discretion of the court." (5) Sections 5 and 8 of the act are unconstitutional as violative of article 4, sections 28 and 53, of the constitution. Said section 53 provides that the general assembly shall not pass any special law "regulating the practice or jurisdiction of, or changing the rules of evidence in, any judicial proceeding or inquiry before courts;" and section 28, that no bill shall contain more than one subject, and the purpose of an act shall be clearly expressed in the title. The act contains a radical departure in the laws of evidence; it creates an artificial presumption against a defendant, and there is nothing in the title of the act indicating that it contains any such special feature. There is no case in Missouri where an act has been declared unconstitutional because it was a special act and changed the rules of evidence. Prior to the constitution of 1875, either

general or special laws might have been enacted, changing the rules of evidence even as to existing causes of action. Cooley, Const. Lim. [6 Ed.], p. 450; *Abbott v. Lindenbower*, 42 Mo. 162. The right to have one's controversies determined by existing rules of evidence is not a vested right. Cooley [6 Ed.], p. 450. But since the constitution of 1875, no special act having this effect is allowable. The change in the rules of evidence is an important feature of any act, general or special. An act to prevent the sale of butterine need not necessarily contain any change in the ordinary rules of evidence in criminal cases. Such a change in the rules of evidence is not "germane to the subject;" and it makes the act contain more than one subject. *State v. Mead*, 71 Mo. 266. (6) Section 8 of the act violates article 2, section 30, which provides that no person shall be deprived of property without due process of law; also section 11 of the same article, which provides that the people shall be secure in their persons, papers, homes, and effects, from unreasonable searches and seizures. *Lowry v. Rainwater*, 70 Mo. 152; *Fisher v. McGirr*, 1 Gray, 1; *Hibbard v. People*, 4 Mich. 126; *Lincoln v. Gray*, 27 Vt. 355; *River Rendering Co. v. Behr*, 77 Mo. 91; *St. Louis v. Hill*, 116 Mo. 527.

*R. F. Walker*, attorney general, and *J. D. Johnson* for the state.

(1) Appellant's contention that substances other than annato or its compounds, which might be used for imparting a yellow color to imitation butter, are not *ejusdem generis* with "annato or compounds of the same," can not be maintained. There might be some ground for this claim were the phraseology of the title of the act different from what it is, or the words "or any other substance or substances" were not them-

selves followed and enlarged in meaning by the words, "for the purpose or with the effect of imparting thereto a yellow color," etc. These latter words make the special words themselves general in their application or meaning; so that any other coloring substance, which can give to the compound prohibited by the act the yellow shade of butter, is *ejusdem generis* with "annato or a compound of the same." Again, it is apparent from the letter and context of the act, that the legislature intended section 2 to prevent the manufacture and sale, for consumption within the state, as and for genuine butter, of all spurious compounds made of fatty substances and colored yellow, by means of any kind of yellow coloring matter whatever, in imitation of genuine butter; the purpose being to prevent the public from being deceived or defrauded, by the sale of them, or into the use, of the spurious compound. Hence the rule of *ejusdem generis* does not apply. Black on Interpt. of Laws (1896), 141–143; Sutherland on Const., par. 279; *Dart v. Bagley*, 110 Mo. 42–51; *St. Louis v. Herthel*, 88 Mo. 128; *St. Joseph v. Elliott*, 47 Mo. App. 418–420, and cases cited. (2) It was not necessary for the information to aver that the acts charged against defendant did not come within the exceptions or provisions of sections 2 and 5 of the act, as claimed by appellant in his second point. *State v. Meek*, 70 Mo. 355; *State v. O'Brien*, 74 Mo. 549; *State v. Shiflett*, 20 Mo. 417; *State v. Cox*, 32 Mo. 566; *State v. Buford*, 10 Mo. 704; *State v. Sutton*, 24 Mo. 377. Nor is it necessary to negative the exceptions contained in a section of an act different from the section creating the offense. *State v. O'Gorman*, 68 Mo. 179; *State v. Doepke*, 68 Mo. 208; *State v. Jaques*, 68 Mo. 261. This rule applies to informations the same as to indictments. R. S., secs. 4061, 4114. (3) Appellant's contention that the whole act is void,

because section 11 prescribes that "all fines collected under the provisions of this act shall be covered into the state treasury," contrary to section 8, article 11, of the state constitution, which directs that all fines for any breach of the penal laws shall belong to the public school fund of the counties in which they are collected, can not be sustained. If, however, section 11 is unconstitutional, as claimed, but which we do not concede, then that fact does not invalidate the rest of the act, because an act may be unconstitutional and void in part and constitutional and valid in part. *State ex rel. v. Field*, 119 Mo. 612; *Tarkio v. Cook*, 120 Mo. 1; *St. Louis v. Railroad*, 89 Mo. 44; *State v. Kring*, 74 Mo. 612; *Ensworth v. Curd*, 68 Mo. 282; *State v. Clark*, 54 Mo. 17. The entry of the judgment was complete without the italicized words, and there was no more authority of law for inserting them in the judgment than there would have been for inserting a clause under the proviso of section 11 of the act, to the effect that the fine imposed "shall be covered into the state treasury." Those words should be treated here as mere surplusage. (4) This case is the first prosecution against the defendant under the act, so that he was subject to the punishment prescribed by the first subdivision of section 7, which a jury was empowered to impose, and not under the second subdivision, which seems to give to the trial court the fixing of the penalty, hence appellant's objection that section 7 is violative of section 22 of the bill of rights does not apply to this case. (5) This prosecution being under section 2 of the act for selling, keeping for sale, etc., the presumptions created by sections 5 and 8 do not apply to the case. (6) Nor is the act a local or special law within the purview of section 53, article 4, of the state constitution. *State v. Jackson*, 80 Mo. 175; *Lynch v. Murphy*, 119

Mo. 163; *State ex rel. v. County*, 128 Mo. 427. (7) Sections 5 and 8 do not change the rules of evidence and are not open to the objection that their purpose is not expressed in the title to the act. *State v. Bennett,* 102 Mo. 356; *State v. Morgan*, 112 Mo. 202; *State ex rel. v. Bronson*, 115 Mo. 271; *State v. Blackstone*, 115 Mo. 424; *Lynch v. Murphy*, 119 Mo. 163; *State ex rel. v. County*, 128 Mo. 427.

SHERWOOD, J.—1. The evidence already detailed was sufficient to authorize a conviction of defendant under the charge contained in the information; and the fact that the sale in question was made by a young clerk of defendant's, made out against defendant a *prima facie* case, inasmuch as the sale occurred in defendant's store, in apparently the ordinary course of business. *State v. McCance*, 110 Mo. 398. If the sale was made against the order of the owner, this was matter of defense. *Ibid.; State v. Baker*, 71 Mo. 475.

2. Nor is the conclusion just announced as to the sufficiency of the evidence at all affected by the fact relied on by the defendant's counsel that the information does not "charge nor the proof show what was combined with the animal fat to give it a yellow color," nor because the information does not allege nor the proof show that such substance thus combined was either "annatto or a compound of the same."

There are several reasons which support this view:

*First*, it was entirely competent for the information to allege that certain substances were "also compounded with other substances which are to the informant unknown, for the purpose and with the effect of imparting thereto a yellow color," etc. The rule *ejusdem generis* urged for the defense, is wholly inapplicable to a statutory section worded like section 2. The words which immediately follow "any annatto or com-

pound of the same" effectually take this clause of the section out of the operation of the rule announced in *Schuchmann's* case, 133 Mo. 111, and bring it within the rule laid down in *St. Louis v. Bowler*, 94 Mo. 630.

And doubtless the words immediately succeeding those just quoted were inserted for the express purpose of avoiding the necessity of proving just what substance or substances were used to impart to the mixture a yellow color,. etc.  Just so the substance used had that *"effect,"* it was entirely immaterial under the statute *what* substance was used.  This point being thus determined supports the sufficiency of the information in this regard and of course, the evidence offered in support of the questioned allegation.

3.  But it is urged that the information is insufficient in another respect, to wit: That it does not negative the proviso contained in section 2.

The latter clause of that section just below that proviso is the one on which the information is bottomed.  This is a distinct and independent clause, and the rule in such cases is that where an affirmative offense will appear without reference to the proviso or exception, there such proviso or exception need not be negatived in the indictment or information.  In other words, if the ingredients constituting the offense are capable of exact definition without reference to the exception or proviso, there such reference may with safety be omitted, since such matter contained in the exception, etc., is not descriptive of the offense, but only matter of defense to be brought forward by the accused.  1 Bishop, Crim. Proc. [3 Ed.], secs. 632–636; *U. S. v. Cook*, 17 Wall. 168; *State v. Buford*, 10 Mo. 704; *State v. Shiflett*, 20 Mo. 417; *State v. Cox*, 32 Mo. 566; *State v. Sutton*, 24 Mo. 377; *State v. Meek*, 70 Mo. 355; *State v. O'Brien*, 74 Mo. 549.

Elsewhere the same rule finds expression to the

effect that where the statute creates a *general* offense, an offense not limited to a particular class of persons or conditions; where it is intended to impose the stamp of criminality on an *entire class* of actions, and not upon only such actions as are committed by particular persons or in a particular way; in such case the mere *excusatory* defense is not required to be negatived by the written accusation. Wharton, Crim. Pl. & Prac. [9 Ed.], sec. 241.

And it is well settled in this state also, and on like reasoning, that it is needless to negative exceptions contained in a subsequent section to that which defines the offense. *State v. O'Gorman*, 68 Mo. 179; *State v. Doepke, Ibid.*, 208; *State v. Jaques, Ibid.* 261.

So that counsel's contention that the information should have negatived the exception in section 5 of the act before us can not prevail. Indeed it would be without parallel in criminal pleading to require the accusation based on a section defining one offense, to negative an exception in another and subsequent section which section creates another and distinct offense.

4. It is claimed on behalf of defendant that the act under review is violative of several constitutional provisions, which will now be noticed.

Section 28 of article 4 of our constitution forbids that any bill shall "contain more than one subject, which shall be clearly expressed in its title."

In *State ex rel. v. Mead*, 71 Mo. 266, in considering this constitutional provision it was ruled that the title of an act "concerning popular elections" was a sufficient compliance with the constitutional mandate aforesaid, and a sufficient indicator of what the body of the act contained, notwithstanding one of the sections of the act authorized the governor to fill vacancies occurring in elective offices by temporary appointments, such

power thus conferred on the governor being regarded as germane to the subject treated of in the title.

See, also, *St. Louis v. Weitzel*, 130 Mo. *loc. cit.* 614 *et seq.*, where a charter provision identical in language with the constitutional provision above noticed, was discussed and a like ruling applied.

In New Jersey under a similar constitutional provision, an act entitled, "an act relating to the assessment and revision of taxes in cities of this state," was held not to infract the constitutional provision in question notwithstanding the body of the act related to the mode of appointing the members of boards of assessment and revision in cases of taxation, and that the title sufficiently expressed the subject. *State ex rel. v. Hammer*, 42 N. J. L. 438.

Treating of this topic, Bishop tersely says: "The title need indicate the subject only in a general way, without entering into details; and all auxiliary provisions properly attaching to it, and constituting with it one whole, may be embraced within the enactment." Statutory Crimes [2 Ed.], sec. 36a.

In consequence of this view section 5 of the act must be regarded as sufficiently indicated by the title of the act, and as not transgressing constitutional limitations.

But it is not perceived that defendant has any apparent concern in section 5, since that section relates to an entirely different offense.

Now nothing is better settled than that a part of a law may be declared constitutionally invalid, and yet another portion properly separable therefrom, and therefore unexceptionable in every particular. This may be so even though the sound and unsound are in one section together. This is always the rule unless the parts sound and unsound are so mutually related,

so blended together, as to constitute an entirety, making it evident that unless the act be carried into effect as a whole, it could not have received the legislative sanction. Bishop, Stat. Crim., sec. 34, and cases cited. There seems to be no such indication observable in this instance.

Section 53 of article 4 of the constitution is pressed upon our attention, and a portion of that section quoted, to wit:

"The General Assembly shall not pass any local or special law; * * * Regulating the practice or jurisdiction of, or changing the rules of evidence in any judicial proceeding or inquiry before courts."

After making this quotation, counsel then says:

"Sec. 8 of the act provides: 'Whoever shall have possession or control of any imitation butter, or any substance designed to be used as a substitute for butter, contrary to the provisions of this act, shall be construed to have possession of property with intent to use it, as a means of committing a public offense.'

"While I consider the act itself as a *general* act, as it applies to everybody who handles imitation butter, yet the question arises, can the General Assembly by a general law create a new offense and in it change the rules of evidence as to that offense, without giving any warning in the title of the act as to the proposed change in the rules of evidence?

"*In so far as the act changes the rules of evidence as to the offense condemned by the act, it is special.*

"If all of this act had been already in the statutes except sections 5 and 8, and a new act containing the provisions of sections 5 and 8 only had been passed, it would undoubtedly have been a special law changing the rules of evidence.

"The question here arises, can the legislature pass a special law changing the rules of evidence, by

injecting it into the body of a general law? And if so, can this be done without giving warning of the special feature of the title to the act?"

It will be seen that counsel admits that "the act itself is a *general* act." If so, it is difficult to see how it could possibly become a *special* act merely because it changes the rules of evidence, nor how an act which creates a *"new offense"* could be said to *"change the rules of evidence,"* as to a crime then *for the first time created.*

Acts are quite common making certain acts presumptive or *prima facie* evidence of the commission of certain crimes; their constitutionality can not, in circumstances like the present, be doubted. *State v. Buck,* 120 Mo. 479, and cases cited.

So that in no event could the rules of evidence be said to have been changed in the present instance from what they have heretofore been in numerous similar cases, for a valuable collection of which see *Buck's* case, *supra.*

Of course if the act made something *"conclusive evidence"* of guilt as claimed by counsel it would be clearly unconstitutional, because thereby it would cut off all opportunity for one accused of its violation of offering any evidence in his defense. We regard the words of section 8, *"shall be construed,"* etc., as simply meaning that such acts as are therein mentioned, shall be deemed *prima facie* evidence of possession, etc.

Such has always been the rule of evidence at common law, as to the recent possession of stolen property and is the well established rule in this state. Such is the rule of evidence as to the possession by the accused of counterfeit coin or to the discovery of coining tools in his house, as affording presumptive evidence of his guilt of counterfeiting. 3 Rice, Evid. (Crim.) 783. And so of the possession of a forged

instrument by a person who claims under it.    *State v. Yerger*, 86 Mo. 33, and cases cited.

As to the sufficiency of the title of the act, enough has already been said, but while on this point we have no hesitation in saying that the title would have been all that was necessary had it simply been "An act prohibiting the manufacture or sale of imitation butter."

5.    The evident object and dominating idea of section 2 when considered in connection with section 8 of the act, was to prevent the manufacture or sale of a spurious article of butter; and we consider that the state has the same right to forbid and punish the manufacture of *counterfeit butter* that it has to forbid and punish the manufacture of *counterfeit coin*.

The like view was taken by us of the validity of the act of 1881, in relation to the manufacture or sale of imitation butter (*State v. Addington*, 77 Mo. 110), though the latter act contained no such provisions as are contained in section 8 of the present act.

In *Powell v. Com.*, 114 Pa. St. 265, a statute very much resembling that in *Addington's* case was held unobjectionable on constitutional grounds, though the article was marked and sold as "oleomargarine butter," and was a wholesome and nutritious article of food, and *Addington's* case was cited with approval. The judgment in *Powell's* case was afterward affirmed by the supreme court of the United States. *Powell v. Pennsylvania*, 127 U. S. 678.

In Minnesota a statute substantially identical to that in *Addington's* case was held valid. *Butler v. Chambers*, 36 Minn. 69.

On similar grounds in Massachusetts a statute was held constitutional which prohibited the sale of milk, though adulterated with an admixture of only *pure* water. *Com. v. Waite*, 11 Allen, 264.

In New York a statute virtually the same as that

of Pennsylvania, was ruled to be violative of the organic law because it prohibited the manufacture of an article designed to "*take the place* of butter or cheese produced from pure unadulterated milk, or cream of the same." *People v. Marx*, 99 N. Y. 377.

In the subsequent case, however, of *People v. Arensberg*, 105 N. Y. 123, a later act, entitled as was the former one, "an act to prevent deception in the sale of dairy products," was held valid, the only difference in the phraseology of the two acts being that the latter contained the words: "In *imitation or semblance* or designed to take the place of natural butter," etc., and on this difference in the two acts a distinction was taken in favor of the validity of the latter act and against the former, on the ground that the latter act was aimed to prevent deception.

The great preponderance of authority sustains the view announced in *Addington's* case, the theory of which was the right of the state in the exercise of its police power to forbid the manufacture or sale of articles which could readily be used for the purposes of deception, although not perhaps designed originally for that purpose.

6. After the momentary digression in the preceding paragraph we resume the thread of contention made by defendant's counsel. He claims that: Section 7 of the act concerning imitation butter provides that any person who violates it shall be fined or imprisoned "in the discretion of the court," and that this section violates sections 22 and 28 of the bill of rights, the former section giving the right to "a speedy public trial by an impartial jury of the country;" the latter declaring: "The right of trial by jury, as heretofore enjoyed, shall remain inviolate."

In the first place, section 7 does not permit an accused prosecuted for "the first offense" to be punished

"in the discretion of the court;" such permission is only given upon conviction of the *second* offense; so that it is no concern of defendant's that a second offense may be punished as indicated in section 7.

The offense created by the act before us is a *misdemeanor*, which is defined as "any indictable offense under a felony." Anderson's Law Dict. Or as our statute has it, "every offense punishable only by fine or imprisonment in a county jail, or both." R. S. 1889, sec. 3975. This offense, then, being a misdemeanor, it was competent for defendant under the terms prescribed by statute to waive a trial by jury just as he did and submit his trial to the court whose finding thereupon had the "force and effect of the verdict of a jury." R. S. 1889, sec. 4190.

This section was first enacted in 1855. 2 R. S. 1855, p. 1189, sec. 2. This statute has been on the statute books ever since, and thousands of convictions have been had under it. Gen. Stats. 1865, p. 848, sec. 2; R. S. 1879, sec. 1890. See, also, *State v. Moody*, 24 Mo. 560; *State v. Larger*, 45 Mo. 510.

This being the case, it can not be said that defendant has been denied "the right of trial by jury as heretofore enjoyed," since whatever was the *status* of that right at the time of the adoption of the constitution of 1875, was the status referred to in that instrument. 1 Bishop, Crim. Proc. [3 Ed.], sec. 892; 3 Am. and Eng. Ency. of Law, 720, and cases cited.

As to that portion of section 7 which provides for the punishment of "each subsequent offense," even were it regarded as unconstitutional, it would not, under the rule announced in paragraph 4, affect the present conviction, because that portion of the section relating to subsequent offenses is readily separable from the portion which immediately precedes it. Nor is it true that the subsequent offense clause leaves the punishment as

to such offenses "entirely in the discretion of the court," since that discretion is limited in positive terms, to a fine not less than $250, nor more than $500," etc. In short, it is no more in the absolute discretion of the court to fix the measure of punishment as to a subsequent offense, that is allowed to juries in many sections of the criminal code, and the exercise of this right on their part has hitherto remained unquestioned.

7. We do not consider it necessary to discuss the point whether the proviso in section 8 of the act is repugnant to section 30 of article 2 of our organic law, in regard to deprivation of property without due process of law, nor to discuss whether it is likewise opposed to section 11 of the same article in regard to unreasonable searches and seizures, and we refrain from doing so for these reasons:

Defendant has been convicted after trial in due course of law and therefore is in no situation to invoke section 30 aforesaid; nor for a similar reason, can he invoke section 11 before mentioned, because his property has not been subjected to unreasonable search or seizure. It will be time enough to cross that bridge when fairly encountered on the highway of adjudication.

8. But it is urged that section 11 of the act can not stand because it contravenes section 8 of article 11 of the constitution in reference to the destination of all fines imposed for violation of penal laws, relative to which it may be observed that under considerations previously set forth, that section of the statute may be stricken out or disregarded, and still leave a valid law intact and sufficient for the punishment of the offense with which defendant stands charged.

9. Finally, the point is made that the judgment herein is unauthorized by law in that it requires the

fine to be paid "to the state of Missouri, *for the use of the city of St. Louis.*"

The judgment would undoubtedly have been in proper and usual form had it omitted the italicized words. Inasmuch, however, as there was no necessity for the judgment to specify to what purpose the fine should be applied; inasmuch as without any direction in the judgment therefor, it was the duty of the sheriff to pay over the fine to the proper representatives of the board of public schools of the city of St. Louis (*In re Staed*, 116 Mo. 537), and inasmuch as this is a case of misdemeanor, we shall order the judgment to be amended by striking out the unnecessary words, and as thus amended, we affirm it. All concur.