THE STATE ex inf. CROW, ATTORNEY-GENERAL, v. TOWNS.

In Banc, December 19, 1899.

1. Office: OUSTER: SPECIAL COMMISSIONER: FINDINGS: EXCEPTIONS. Where the Attorney-General begins proceedings in the Supreme Court to oust a county clerk from office for having violated the Corrupt Practices Act, and a special commissioner is appointed by the court to take the testimony and make a finding and report thereon, the court reserving the power to review his rulings "upon exceptions by either party," and in his report he finds against the defendant on one of the charges, and no exceptions have been filed, by either side, the court will not consider arguments by the Attorney-General against the commissioner's finding for the defendant on another charge.

2. **Corrupt Practices Act:** PROMISE OF DEPUTYSHIP: OUSTER. A promise made by a candidate for the nomination of his party to the office of county clerk, to appoint another his deputy at a salary of $1,500 per year in case of his nomination and· election, if such promise is made for the purpose of securing a vote or votes for the nomination of such candidate, is a violation of the Corrupt Practices Act of Missouri, and is sufficient to oust him from office.

3. ————: JURY TRIAL: DUE PROCESS OF LAW. The Act of 1893, relating to corrupt practices in elections, commonly known as the Corrupt Practices Act, does not violate the Constitution in that it provides a method of ouster without a trial by jury, nor does it deprive its violater of "life, liberty or property without due process of law," since it contemplates that he is to have his day in court.

4. ————: SUPREME COURT: ORIGINAL JURISDICTION: REMEDIAL WRITS. The Supreme Court has original jurisdiction of ouster proceedings under such act, not by reason of the act itself, but because of the constitutional provision conferring on the court power to issue "other original remedial writs and to hear and determine the same."

   *Held*, by VALLIANT, J., in a separate opinion, that this court does not get jurisdiction of this cause under the language of the Constitution conferring on it power to issue "other original remedial writs," but because this proceeding is in the nature of a *quo warranto*.

5. ————: CONSTITUTION: DEFEATED CANDIDATE. So much of the Corrupt Practices Act as authorizes a trial of a person elected to the office of county clerk for a violation thereof, and his removal from office therefor, is constitutional. But so much thereof as directs the court to include in its judgment of ouster an award of the office to the defeated candidate, is violative of the constitutional provision which confers on the Governor the power of appointment in case of vacancy in the office of a clerk of a court of record.

*Quo Warranto.*

WRIT OF OUSTER AWARDED.

*Edward C. Crow*, Attorney-General, *Sallee & Crossan* and *J. W. Peery* for relator.

(1) The contract entered into between Owens, Hoffman and Towns was a corrupt bargain, and constitutes bribery

within the meaning of that term as used in the election laws. R. S. 1889, sec. 3722; Laws 1893, p. 157, secs. 1, 2, 3 and 10; 10 Am. and Eng. Ency. of Law (2 Ed.), pp. 783 to 794; 4 Am. and Eng. Ency. of Law (2 Ed.), pp. 911, 912; State ex rel. v. Collier, 72 Mo. 13; Harding v. Stokes, 1 M. & W. 354; Chatham's case, 2 P. R. & B. El. Cases 39; German v. Rothery, 20 Can. Sup. Ct. Rep. 376; Nicholls v. Mudget, 32 Vt. 546; U. S. v. Worrall, 2 Dall. 384; Mason v. State, 58 Ohio St. 30; State v. Good, 15 Ohio, Cir. Ct. Rep. 386.    (2) Nor does the alleged fact that the parties to the corrupt contract mutually agreed to destroy the written evidence of it; nor even to rescind it; nor that Owens and Towns agreed to modify it by substituting Owens for appointment as deputy county clerk instead of Hoffman, affect the question of bribery, or relieve the transaction from the taint of corruption.    10 Am. and Eng. Ency. of Law (2 Ed.), 783; R. S. 1889, sec. 3722; Laws 1893, p. 158, secs. 2 and 3.    (3)    The contract upon its face shows that it refers to both the nominating and general elections.    It is as follows:    "This agreement between the parties hereto witnesseth:    That in the event of the nomination and election of the undersigned W. F. Towns to the office of county clerk of this (Harrison Co., Mo.) the said Towns hereby agrees to appoint the said Hoffman as his deputy, and to allow him $1,500 per year deputy salary for such time as said Towns may hold said office, whether for one or two terms."    (4)    The primary election held by the Republican party of Harrison county on April 30, 1898, was "an election under the laws of this State."    R. S. 1889, secs. 4795 to 4798; Keating v. Hyde, 23 Mo. App. 560; McCrary on Elections, sec. 192; Com. v. Bell, 145 Pa. St. 374; Leonard v. Com., 112 Pa.St.607. (5) The record conclusively shows that respondent knew of the payment to witnesses Wm. Weese and Maurice Noah, and there is no evidence that he raised any objections thereto; or that he made any objection to all of the numerous bills which he knew were being incurred in his behalf

by his manager.   (a) "It is impossible to lay down any precise rule as to what will or will not constitute an agency, for, as it has been truly said, the result of all the cases on the subject, and the principle to which resort must ever be had, is that the question is one of fact and must be decided in every case according to the particular circumstances attendant upon it. But this much is settled:   That the doctrine as to the proof of agency by the acts and conduct of the person claiming to be an agent is carried further in election matters than in civil cases."   10 Am. and Eng. Ency. of Law (2 Ed.), p. 795; Bushby on Elections, 120; Colter v. Glenn, 17 Can. S. C. R. 170; State v. Good, 15 Ohio Cir. Ct. Rep. 386.  (b)  It makes no difference whether a candidate pays any money directly, and out of his own pocket, or whether it was paid for him and for his benefit by his friends and agents; if the amount thus paid out exceeds the amount allowed by law as the limit of his expenses, his election is void.   State v. Good, 15 Ohio. Cir. Ct. Rep. 386.   (6)   The Act of March 31, 1893   (Laws 1893, p. 157), is not in any of its provisions obnoxious to the Constitution.   The constitutionality of a similar act has been affirmed by the Supreme Court of Ohio.   Mason v. State, 58 Ohio St. 30.   (a)   The act is not unconstitutional because it does not provide for a trial by jury.     State ex rel. v. Vail, 53 Mo. 107; State ex rel. v. Lupton, 64 Mo. 415; Mason v. State, *supra*.   (b)   The act is not unconstitutional because it deprives the officer guilty of bribery of his office.   10 Am. and Eng. Ency. of Law (2 Ed.), p. 781; State ex rel. v. Collier, 72 Mo. 13; McCrary on Elections (1 Ed.), sec. 432.   (c)   It is not unconstitutional because it gives the office to the person receiving the next highest number of votes.   This provision amounts to a statutory declaration that the votes cast for the candidate guilty of bribery shall not be counted.   All of the cases concede that if there is such a statutory provision, the person receiving the next highest number of votes is entitled to the office.   10 Am. and Eng. Ency. of Law (2 Ed.), p. 758;

State ex rel. v. Boal, 46 Mo. 528; State ex rel. v. Walsh, 7
Mo. App. 142; State ex rel. v. Vail, 53 Mo. 97. In any event,
could the respondent in this proceeding be heard to urge that
the provision for awarding the office to the person receiving
the next highest number of votes is unconstitutional when
he would not be injured by such a judgment? "Only those
whose rights would be prejudiced by the enforcement of an
unconstitutional act will be heard to question its validity." 6
Am. and Eng. Ency. of Law (2 Ed.), p. 1090; Newman v.
People, 23 Colo. 300; Railroad v. Montgomery, 49 N. E. Rep.
582; Kansas City v. Railroad, 53 Pac. Rep 468; State v. Mc-
Nulty, 73 N. W. Rep. 87; Smith v. Inge, 80 Ala. 283;
Barkley v. Donnelly, 112 Mo. 561. (7) The objection that
this court has not jurisdiction of the subject-matter of the
action can not be sustained. "The jurisdiction of this court
on informations in the nature of *quo warranto*, whether filed
on the relation of some private person (by leave of court) or
by the attorney-general *ex officio*, must be regarded as settled.
The cases hereinafter cited on the second point are all cases in
which the jurisdiction was exercised without question, and the
cases in which the question has been raised have been deter-
mined in the same way." State ex rel. v. Vail, 53 Mo. 107;
State ex rel. v. McSpaden, 137 Mo. 628.


*Wanamaker & Barlow, J. C. Wilson* and *Warner, Dean
& McLeod* for respondent.


(1) This is purely a special proceeding under the act of
1893. Under this act the Attorney-General has no right or
power, *ex officio*, to institute general proceedings in *quo war-
ranto*. The defeated candidate must take the initiative by
making an application to him. The applicant is required to
specify the charge, and the Attorney-General must bring the
action to have the office declared vacant on account of the

violation embraced in the charge. He is limited to the charges specified by the applicant, and the office can only be declared vacant on account of said violation. State ex inf. v. Bland, 144 Mo. 534. (2) The act is penal in its every nature and fibre. It should be strictly construed. Nothing should be regarded as included in it which is not clearly and intelligently described in its very words. State ex inf. v. Bland, 144 Mo. 534; Rozelle v. Harmon, 103 Mo. 339; Connell v. Western Union Tel. Co., 108 Mo. 459; State ex rel. v. Smith, 114 Mo. 180; Dudley v. Western Union Tel. Co., 54 Mo. 381. (3) The informant in his brief submits the proposition for consideration that Owens was the general agent of Towns in his campaign, both before and after the primary. Such a proposition is not borne out by record. (a) A principal is not criminally responsible for the acts of his agent, done in his absence and without his knowledge or consent. State v. McGrath, 73 Mo. 181; State v. McCannee, 110 Mo. 399; State v. James, 63 Mo. 571. (b) A candidate is not responsible for the corrupt practices committed by his agents, unless such illegal acts have been committed with his knowedge and consent, expressed or implied. 10 Am. and Eng. Ency. of Law (2 Ed.) 794; Flint v. Fitzsimmons, Hodgins Election Cases 139; Stewart v. McDonald, Ib. 625; Rykert v. Neelon, Ib. 391; Rey v. Dewar, 26 Ont. Rep. 512; Remick v. Camcron, 8 U. C. L. J., N. S. 113. (4) This is not primarily a proceeding between individuals to try the right as between them to the possession of an office. It is an inquiry by the State of one of her citizens by what right he "holds or executes an office." State ex rel. v. Francis, 88 Mo. 557; State ex rel. v. Norton, 64 Mo. 415; State ex rel. v. Vail, 53 Mo. 97; Vail v. Dinning, 44 Mo. 210. This court then has not jurisdiction in this case. (a) It is not *quo warranto* in the meaning of the Constitution. State ex inf. v. Bland, 144 Mo. 534. (b) The court can not assume jurisdiction nor hear and determine cases in any other manner than that provided for in the Con-

stitution. The General Assembly can confer original juris-
diction only in cases specified in the Constitution, in all other
case its jurisdiction must be appellate. Foster v. State, 41
Mo. 61; Vail v. Dinning, 44 Mo. 210; State v. Flentge, 49
Mo. 483; State ex rel. v. Mason, 77 Mo. 189.

MARSHALL, J.—This is an original proceeding, in-
stituted by the Attorney-General, on the written application
and specific charges of Charles A. Tull, the defeated candidate,
under the provisions of the Act of 1893 (Laws 1893, p. 157)
to prevent corrupt practices in elections, to oust defendant
from the office of clerk of the county court of Harrison county,
for violations at and prior to the general election of 1898 of
provisions of that Act in five respects, to wit: First, failure to
file a sworn statement of his expenditures and promises;
second, exceeding the limit of expenditure allowed by that act;
third, entering into an agreement, first, with an opposing can-
didate for the nomination, one Hoffman, to appoint him
deputy clerk, if he was nominated and elected, provided Hoff-
man remained in the field, and afterwards, when the fact of
such agreement became known, of making an agreement with
one Owens to appoint him his deputy if he would work for
his, defendant's, nomination and election; fourth, making an
agreement with one Roberts to appoint him deputy clerk upon
similar conditions; and, fifth, making a similar agreement
with one Morgan.

The answer of respondent controverts these charges,
and avers that the Act of 1893 is unconstitutional, and
specially sets out that it violates sections 1, 2, 9, 28 and 30
of article II, and sections 1, 2 and 3 of article VIII of the
Constitution.

The Attorney-General demurred specially to the portion
of the answer setting up the unconstitutionality of the Act
of 1893, and replied to the remainder of the answer.

The application of Tull to the Attorney-General requested that he be made a party to the action under the provisions of section fifteen of the Act, and that defendant be ousted from and he be awarded the office. Tull was not made a party as requested, but he has, since the taking of the testimony, filed a motion to be made a party and asking leave to have the petition amended so as to specifically aver his qualifications for the office. The defendant objects to the amendment because, no such issue having been tendered by the petition, no opportunity has been afforded defendant to controvert or disprove the averments as to Tull's qualifications, as section fifteen of the Act permits, in order to prevent an award of the office to Tull.

On the 2d of June, 1899, the court appointed Hon. Charles H. S. Goodman, special commissioner to take the testimony and make a finding and report thereon, reserving however, the power to review the rulings of the commissioner, at or before the final hearing of the cause, "upon exceptions by either party." The special commissioner heard the testimony and made a finding and report, in which he finds for the defendant upon all of the charges except the third, and as to that he finds that it is true. No exceptions have been filed by either party, although relator argues here against the finding of the commissioner as to the second charge, but under the terms of the order appointing the commissioner requiring exceptions to be filed, this contention will not now be considered, and the decision will be confined wholly to the law applicable to the finding of facts by the commissioner as to the third charge, treating that finding as the verdict of a jury in an action at law.

The commissioner's finding of facts as to the third charge is as follows:

"Upon mature deliberation I submit the following as my finding of the facts established by the evidence.

"The primary election of the Republican party in the county of Harrison for the nomination of the several county officers to be voted for at the general election in November, 1898, was held April 30th, 1898. Before said primary election were the following candidates for the office of county clerk: William F. Towns, of Adams township; James M. Kinkade, of White Oak township; F. J. Hesseltine, of Cypress township; Wilson C. Baldwin, of Dallas township; Leslie P. Riley, of Clay township; H. J. Skinner, B. L. Fuller and W. L. Hoffman, of Bethany township; and John T. Courter, of ——— township.

"George L. Owens, who appeared as a witness on behalf of the informant, was a brother-in-law to William L. Hoffman. Owens was mayor of the city of Bethany, was engaged in the farming-implement business, had been school commissioner for the county of Harrison, was extensively acquainted throughout the county, and was regarded as one of the most influential and adroit political managers in the Republican party in said county. Owens and Towns were raised in the same part of the county, had been acquaintances from boyhood and warm feelings of friendship existed between them. Early in January, 1898, Towns approached Owens, informed him that he was about to become a candidate for the office of county clerk, and requested Owens' aid and influence. Owens did not give him any definite assurance of support, but gave him to understand that he was favorable to his candidacy. Early in the month of April, 1898, Owens became convinced that Hoffman had no chance of securing the nomination, as he had recently filled the office of county treasurer for two terms, and that Hoffman would have to content himself with a deputyship under the successful candidate if he secured anything. Owens at that time believed that the race for the nomination lay between L. P. Riley, who lived in the north part of the county, and Towns, who lived in the south part. Prior to his election to the office of county treasurer, Hoffman

had lived at Eagleville in the north part of the county, and as there were two other candidates from Bethany his principal support must come from the north half of the county. Owens conceived the plan of effecting a combination between Hoffman and Towns, by which the latter, if nominated, a nomination being considered equivalent to an election, should appoint Hoffman his deputy. He first approached Hoffman on the subject, and finding him favorable to the project, opened negotiations with Towns, which resulted in the parties signing the agreement dated April 8th, 1898, and read in evidence, by the terms of which, in the event of his nomination, Towns agreed to appoint Hoffman his deputy at a salary of $1,500, for such time as Towns should hold office. Hoffman, after the signing of the agreement, which was witnessed by Owens and left with him for safe keeping, claimed that he was still in the race and that he would do his best to secure the nomination. It is evident, however, that this declaration was not made in good faith, for it was agreed that Owens should manage the campaign for both Towns and Hoffman, and he, Owens, directed all his energies to secure the nomination of Towns and voted for him in the primary election. Hoffman continued in the race, but directed his efforts to secure votes in the north half of the county, which would have the effect of weakening Riley, as the Hoffman vote would otherwise have been given to the former. A short time previous to the primary election it became noised about that Hoffman and Towns had entered into a combination, and fearing the effect of this rumor Hoffman published in all the Republican papers in the county a card denying that there was any such combination. After the execution of the agreement Owens was specially active in behalf of Towns, directed his campaign, spent money freely for him, and on the day of the primary election at Bethany gave his whole attention to Towns' interests, employing men to canvass and electioneer, others to keep a list of Republican voters and check them off as they voted; all of this

with such effect that, notwithstanding there were three candi-
dates from Bethany township, Towns received more votes than
all the other three combined, and secured the nomination,
the competitor receiving the next highest number of votes
being L. P. Riley of Clay township.   To this result the efforts
of Owens largely contributed, he himself voting for Towns,
notwithstanding his brother-in-law, Hoffman, was still nomi-
nally in the race.

"Towns testified that he considered the agreement entered
into to appoint Hoffman annulled, but his statement to that
effect is not borne out by the facts, for he was fully cognizant
of all the efforts that were made in his behalf by Owens, and
on the day preceding the primary election went with Owens to
secure the services of Weese, a Democratic voter, to work for
him at the primary election, for which service Weese was paid
$5, and on the day of the primary election told parties who
were working for him and were seeking instructions, to go and
see Owens.   Hoffman also testified that he considered the
agreement annulled, but in this statement is contradicted by
his letter of November 19, 1898, in which he expresses his
indignation and disappointment at Towns' refusal to appoint
him deputy.

"After the primary election and before the general elec-
tion in November, 1898, Towns informed Owens that he
could not appoint Hoffman his deputy, as it would injure his
chances for a second term, but that he was willing to pay him a
sum of money, $500, and all his expenses, in lieu of such ap-
pointment.   He then promised Owens that in consideration
of his services rendered and to be rendered in his behalf he
would appoint him his deputy, such appointment to hold good
during his, Towns', incumbency of office.   Spurred by this
prospective reward, Owens used his utmost efforts to secure
the election of Towns, and by his skill in politics and his
adroitness as a political manager, rendered him valuable and
efficient aid.

"At the general election in 1898 Towns was elected to the office of county clerk, received his commission as such, has duly qualified and is now discharging the duties of the office by virtue of such election, commission and qualification. Charles A. Tull, the informant herein, was his opponent at the general election and received the next highest number of votes for the office of county clerk. I further find that but for Towns' promise to appoint Hoffman as his deputy, Owens would not have supported said Towns in the primary election, and but for his promise to appoint Owens as his deputy the latter would not have voted for or supported him at the general election."

I.

The third charge is therefore sustained by the finding of facts, and there is abundant evidence to support the finding, and the defendant has not excepted to it. It only remains then to determine whether the acts so found come within the inhibitions of the Act of 1893.

The first section of that Act makes it bribery, 1st, for any person to give or promise to give any money or valuable consideration to any voter in order to induce him to vote or to refrain from voting, or 2d, to promise or promise to procure any office, place or employment, public or private, to any voter in order to induce such voter to vote or refrain from voting, or 3d, to "make any such gift, loan, offer, promise, procurement or agreement as aforesaid, to or for any person, in order to induce such person to procure, or endeavor to procure, the election of any person to a public office, or the vote of any voter at any election."

Section six of the Act limits the amount that any candidate may lawfully expend.

Section ten of the Act permits the defeated candidate, who received the next highest vote, to make application to the Attorney-General, in writing, verified by his affidavit, setting forth one or more of the following charges; first, that the

officer elected exceeded the limit of expenditure fixed by section six; second, "that votes were secured by him or his agent or agents, or with his consent or connivance, or with the consent or connivance of his agent or agents, by some committee or organization, or some political party, of which party such officer was a nominee, or by which he was supported, or the agent or agents of some such committee or organization, by paying, contributing, offering, or promising to contribute money or other valuable thing as a compensation or reward, or by some promise or influence, the giving such vote or votes, or that votes were withheld from such applicant by reason of such practices by or on behalf of such officer, agent, committee or organization, or by reason of some act on behalf of such officer declared by this act to be unlawful," etc.

Section 11 of the Act makes it the duty of the Attorney-General to institute the proceeding, and section 15 of the Act permits the applicant, upon his own motion or upon motion of the defendant to be made a party plaintiff, and if a judgment of ouster is entered, provides that the judgment shall award the office to the applicant, unless upon appropriate pleading and proof by the defendant the applicant shall, himself, be shown to have violated the Act.

The "promise or influence" prohibited by section ten, clearly refers to the "promise, procurement or agreement" specified in section one, made to any person, in order to induce such person to procure or endeavor to procure the election of any person to a public office or the vote of any voter at any election.

It can scarcely be seriously doubted that the agreement between defendant and Hoffman to appoint him deputy clerk at a salary of fifteen hundred dollars a year, "whether for one or two terms," if defendant was nominated and elected to the office of clerk of the county court, was a promise to induce Hoffman to procure or endeavor to procure defendant's election to that office, and the same is true of the subsequent similar

promise to Owens, and the finding of facts by the commissioner is to the effect that such promise resulted in Hoffman and Owens, at least endeavoring to procure, if indeed they did not wholly procure, defendant's nomination and election to that office. So plain is the statute, that defendant does not seriously controvert its meaning, but in his answer confines himself wholly to a flat denial of the fact that any such agreement was made. On the trial he admits the making of the written agreement with Hoffman, but says it was abrogated and annulled before the primary election, and denies the agreement with Owens, but the commissioner found the fact against him, and he was amply supported in this finding by the letters of the defendant himself, even if Owens, whose motives, conduct and character are now assailed by defendant, be eliminated from the case entirely.

Thus the fact is established and the applicability of the law to such a fact is not and can not be denied. The statute pronounces the penalty. The court's power and duty is thus limited to enforcing the law.

The definition of bribery in section one of the Act of 1893 is but a rescript of section 3722, Revised Statutes 1889, which has stood upon our statute books for many years, the only differences being the forum in which the charge may be tried and the pains and penalties prescribed, and was an offense at common law. [4 Am. & Eng. Ency. of Law (2 Ed.), pp. 911, 912, and cases cited in notes.] And the offense specified in the third charge has been held to be bribery in other jurisdictions having somewhat similar legislation against corrupt practices in elections. [Mason v. State ex rel., 58 Ohio St. 30; German v. Rothery, 20 Can. S. C. Rep. 376; Harding v. Stokes, 1 M. & W. 354.] Such agreements have also been held to be against public policy and therefore void, even before the enactment of the Corrupt Practices Act. [Nichols v. Mudgett, 32 Vt. 546.]

## II.

The defendant, however, challenges the constitutionality of the law. Epitomized the sections of the Constitution pleaded are, section 1 of article II, recognizing that the power of government emanates from the people and is instituted solely for the good of the whole; section 2, of article II, recognizing the right of the people to regulate the internal government and police thereof and to change the form of government subject to the Constitution of the United States; section 9, article II, declaring that all elections shall be free and open and prohibiting any civil or military power from interfering with the free exercise of the right of suffrage; section 28, article II, guaranteeing the right of trial by jury "as heretofore enjoyed," and section 30, of article II, declaring, "that no person shall be deprived of life, liberty or property without due process of law."

In the argument and briefs counsel also invokes article III of the Constitution, which divides the powers of the government into three distinct departments, and forbids either to interfere with the other, for the purpose of insisting that a person (like the applicant) can not be injected into office by an act of the Legislature or the judgment of a court, when he has never been elected by the people.

Defendant also pleads section 1 of article VIII, of the Constitution prescribing the time for holding elections; section 2, of article VIII, prescribing the qualifications of electors; and section 3, article VIII, regulating how elections shall be conducted or contested.

We are somewhat familiar with these constitutional provisions and guarantees, but we had never imagined that they were intended to prevent the passage of laws to prohibit corrupt practices in elections. On the contrary those of the provisions cited which have any application to elections contemplate honesty in elections, and like all organic laws,

leave the details to that end to be prescribed by the law-makers. In a word, the act of 1893, is in furtherance of and not in conflict with the letter, spirit and policy of the constitutional guarantees and privileges relating to elections and does not conflict with the right of trial by jury "as heretofore enjoyed," because before the adoption of the Constitution the right of trial by jury was not enjoyed in cases covered by the act nor does the act deprive the defendant of life, liberty or property without due process of law, because it contemplates that he shall have a day in court, in the same manner as every one similarly situated may have, before his rights can be determined or the penalties of the act can be visited upon him.

The Act of 1893 is not unconstitutional for any of these reasons. Article III of the Constitution has no application whatever to the Act in question. A similar Act was held to be constitutional in Ohio (Mason v. State ex rel., 58 Ohio St. 30).

## III.

The original jurisdiction of this court in cases of this character is denied by defendant, and it is insisted that the jurisdiction of this court is primarily appellate and that it has original jurisdiction only by virtue of its general superintending control over all inferior courts, and in cases of *habeas corpus, mandamus, quo warranto, certiorari,* and other remedial writs, and that this is not a proceeding by *quo warranto,* as that writ was understood when the Constitution was adopted, and as decided by this court in State ex inf. v. Bland, 144 Mo. l. c., 557.

The general proposition stated is correct, and it was decided in Bland's case that the proceeding under the Act of 1893 was not a *quo warranto* proceeding, but was purely a creature of that Act. These considerations, however, do not put the stamp of unconstitutionality upon that Act, for the

writ in such cases is essentially an extraordinary, remedial writ, intended to redress wrongs which do not brook of the usual delays incident to a protracted trial in a *nisi prius* court with the possible incidents of changes of venue, continuances, mistrials, new trials, and afterwards the slow process of appeal or writ of error, with the not unprecedented result that the term of office of the defendant will have expired before the case against him is finally adjudicated. The Legislature in creating this new and useful remedial writ therefore required the application to be made to the Attorney-General in the first instance, and commanded him to institute the action, and provided, by section 13 of the Act, that, "Such action shall have a preference on the docket of any court of the State in which the same shall be pending, over all other civil actions whatever." The Act does not attempt, in words, to confer jurisdiction upon this court, nor was it in the power of the Legislature to enlarge or extend the jurisdiction of this court, but the instant the remedy against an offender under the Act was afforded by the Legislature, this court's jurisdiction to hear and determine the action became complete under the original power conferred upon it by section 3 of article VI of the Constitution to issue "other original remedial writs, and to hear and determine the same." The issuance of such an original writ is purely discretionary with the court, and the court is amply able to protect itself against any great and overwhelming influx of similar cases, even if it be conceivable that so many persons will hereafter violate the Corrupt Practices Act as to make the determination of all such cases a burden on the court.

## IV.

This leaves only for consideration the motion of the applicant, Tull, the defeated candidate, for leave to be made a party plaintiff, and to amend the petition so as to aver his

qualifications, and for a judgment awarding him the office as provided by section fifteen of the Act of 1893.

Leave will be granted to him to be made a party plaintiff, but the leave to amend the petition, as prayed, and for a judgment awarding him the office must be denied, for two reasons, first, because such allegations in the petition are not authorized or contemplated by the Act of 1893, but on the contrary that act provides that he shall have a judgment awarding him the office, unless *"upon appropriate pleading and proof by defendant,"* he the applicant, is also adjudged guilty of having violated the act (it being in the nature of a cross-action by the defendant against the applicant), and there is no such pleading by the defendant in this case; there is, therefore, no such issue before the court; and, second, because so much of section 15 of the Act as provides for the judgment awarding the office to the applicant in such cases, is clearly in conflict with section 39, of article VI, of the Constitution which provides: "The St. Louis Court of Appeals and Supreme Court shall appoint their own clerks. The clerks of all other courts of record shall be *elective*, for such terms and in such manner as may be directed by law," etc.; and also with section 11, of article V, which prescribes: "When any office shall become vacant, the Governor, unless otherwise provided by law, shall appoint a person to fill such vacancy, who shall continue in office until a successor shall have been elected or appointed and qualified according to law," and pursuant to this provision it is provided by section 1964, R. S. 1889, that: "When any vacancy shall occur in the office of any clerk of a court of record by death, resignation, removal, refusal to act or otherwise, it shall be the duty of the Governor to fill such vacancy by appointing some eligible person to said office, who shall discharge the duties thereof until the next general election, at which time a clerk shall be chosen for the remainder of the term, who shall hold his office until his successor is duly elected and qualified, unless sooner removed."

In State ex rel. v. Kramer, 150 Mo. 89, it was expressly held that where the Constitution provides that an officer shall be *elected*, it meant the act of choosing, performed by the qualified electors, and that where the electors failed to make a choice, no *appointment* could be made to the office unless expressly authorized by the Constitution. Inasmuch as the Constitution requires all clerks of said courts of record to be elective, and inasmuch as the people have elected the defendant these requiements of the Constitution have been observed. But in this case the person elected or chosen by the people is ousted from the office by a proceeding necessarily begun after the election and qualification of the defendant. When the defendant is ousted, the office, *ipso facto*, becomes vacant. In case of vacancies in such offices as this, the Governor is given the power by the Constitution and the statutes to fill the vacancy. The Act of 1893 does not confer the power of appointment of a successor upon this court. It requires the court to enter a judgment awarding the office to a designated person, who never was elected or appointed. Appointment signifies a discretion in the appointing power as to the person to be appointed. No such power is attempted to be given by section 15 of the Act of 1893 to this court, or any other person. The act awards the office to the unsuccessful candidate, and in so doing it violates the provisions of the Constitution quoted.

So much of the remedial nature of the act as authorizes a trial of the elected officer for a violation of the act, and his removal from the office therefor, is constitutional, but so much of the act as directs the court to include in the judgment of ouster, an award of the office to one who has never been elected by the people violates section 39 of article VI, and section 11 of article V of the Constitution, and hence is void.

From the foregoing it follows that a writ of ouster must be issued against defendant removing him from the office of clerk of the county court of Harrison county, and declaring

that office vacant, to be filled by appointment by the Governor of some eligible person until the next general election, at which time a clerk shall be chosen for the remainder of the term for which defendant was elected.

It is so ordered. *Gantt, C. J.,* and *Brace, Burgess, JJ.,* concur; *Valliant, J.,* concurs in a separate opinion; *Robinson, J.,* dissents as to the finding of facts; *Sherwood, J.,* absent.

## SEPARATE OPINION.

VALLIANT, J.—Whilst concurring in the conclusions reached in the opinion in this case and in the main in the argument of its learned author, nevertheless there is one point on which I feel constrained to express my individual views.

Under our Constitution this court has no original jurisdiction except that conferred by section 3 of article VI, which is as follows: "The Supreme Court shall have a general superintending control over all inferior courts. It shall have power to issue writs of *habeas corpus, mandamus, quo warranto, certiorari* and all other original remedial writs, and to hear and determine the same."

That provision has been in the Constitution of this State ever since its organization. The purpose of that clause was to define the utmost limits within which this court could exercise original jurisdiction, and it is expressed in technical terms, showing that it is the language of men learned in the law. At that time the original remedial writs of the common law were well known. The designation by name of certain writs, all of which were of that character, followed by the general term "other original remedial writs" shows the purpose to restrict jurisdiction to the use of writs theretofore well known of that description.

As eary as Lane v. Charless, 5 Mo. 286, it was held that this court could not issue an injunction because that did not fill the description of an original remedial writ, but in the same opinion it was said that prohibition, which is not men-

tioned by name in that section of the Constitution, was such a writ.

And in Thomas v. Mead, 36 Mo. loc. cit. 247, it is said: "A prohibition is an original remedial writ, and it is old as the common law. It was the king's prerogative writ, provided by the common law as a remedy for 'encroachment of jurisdiction.' "

In State ex rel. v. Stewart, 32 Mo. 379, this court per NAPTON, J., discusses *quo warranto* and informations in the nature of *quo warranto* whether filed by the Attorney-General on his own motion or at the relation of some one interested, in the course of which it is said: "The Constitution has conferred upon this court the power to issue writs of *quo warranto*, and to hear and determine the same. The Legislature can not deprive this court of any jurisdiction conferred on it by the Constitution. This court has already determined that the power conferred by the Constitution extended as well to informations in the nature of a *quo warranto* as to the original writ, which was known as such in the common law." And in State ex rel. v. Vail, 53 Mo. loc. cit. 107, this court by the same judge said: "The jurisdiction of this court of information in the nature of a *quo warranto*, whether filed on the relation of some private person (by leave of the court), or by the Attorney-General *ex officio*, must be regarded as settled."

The Legislature can neither add to nor take from the class of cases of which this court has original jurisdiction. It has no original jurisdiction except through one of the original remedial writs known to the common law, or through a proceeding in the nature of such. The general nature of the remedy furnished by those writs is not lost when they are made to serve new conditions not originally contemplated. The history of the writ of *quo warranto* illustrates this.

In my opinion the sole ground of original jurisdiction of this court over the case at bar is that it is an information in the nature of a *quo warranto*.