LABOR'S EDUCATIONAL AND POLITI-
CAL CLUB—INDEPENDENT et al.,
Respondents-Appellants,

v.

John C. DANFORTH, Missouri Elections
Commission et al.,
Appellants-Respondents,

James C. Kirkpatrick et al., Defendants.

No. 59806.

Supreme Court of Missouri,
En Banc.

Dec. 19, 1977.
Dissenting Opinion Feb. 1, 1978.
Rehearings Denied Feb. 1, 1978.

John W. Inglish, Robert M. Heller, Missouri Elections Commission, John D. Ashcroft, Atty. Gen., Jefferson City, for defendants-appellants-respondents.

Harold L. Fridkin, Richard Rhyne, Albert J. Yonke, Kansas City, for plaintiffs-respondents-appellants.

BARDGETT, Judge.

This appeal is from a judgment of the Circuit Court of Cole County, Missouri, which declared the Missouri Campaign Finance and Disclosure Act (hereinafter Act), sections 130.010 et seq., RSMo Supp.1975, unconstitutional. The various parties, being aggrieved in varying respects, appealed. Jurisdiction is in this court because this case involves the construction of the constitution of Missouri. Art. V, sec. 3, Mo.Const.

The suit was brought by Labor's Educational and Political Club—Independent (LEPCI) and other interested parties. They sought a declaratory judgment as to the validity and constitutionality of the Act and a permanent injunction against its enforcement. The defendants in this action are the Missouri Elections Commission and various public officials (hereinafter referred to collectively as defendants).

LEPCI challenged the Act on numerous grounds. Instead of repeating all of the grounds, it is sufficient to set forth the holdings of the circuit court. The circuit court held in pertinent part that:

"1. One or more of the plaintiffs have a sufficient personal stake in a determination of the constitutional validity of each of the challenged provisions of the Act to present a real and substantial controversy admitting of specific relief, through a decree of this Court, of a conclusive character.

"2. The Court denies the relief requested by plaintiffs in Count I of plaintiffs' Petition but does rule that the entire Act is unconstitutional, invalid and void as it applies to all public offices, created by the Constitution, for which minimum qualification is stated. Therefore, the Court holds that the Act cannot apply to the offices of Governor, Lt. Governor, Auditor, Supreme Court Judges, Appellate Judges, all Circuit Court Judges and Judges of the Probate and Magistrate Courts.

"3. Section 130.020.5, V.A.M.S., is constitutional and does not violate any of plaintiffs' rights guaranteed by the equal protection clause of the Fourteenth Amendment to the United States Constitution, or Article I, Section 10 of the Missouri Constitution, and does not violate any of plaintiffs' rights guaranteed by the First Amendment to the United States Constitution or Article I, Section 8 of the Missouri Constitution. Therefore, plaintiffs are denied the relief requested in Count III of plaintiffs' Petition.

"4. Sections 130.015.1, 130.015.2 and 130.015.5, V.A.M.S., violate rights guaranteed by the First Amendment to the United States Constitution and are unconstitutional.

"5. Section 130.010(4), V.A.M.S., is in violation of the due process clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 10 of the Missouri Constitution, and is unconstitutional.

"6. Section 130.020.7, V.A.M.S., is in violation of the First Amendment to the United States Constitution and Article I, Section 8 of the Missouri Constitution, and is unconstitutional.

"7. Section 130.020.8, V.A.M.S., constitutes a restraint of freedom of speech which is violative of the First Amendment guarantees of the United States Constitution and Article I, Section 8 of the Missouri Constitution, and is unconstitutional.

"8. Sections 130.025.5 and 130.025.7, V.A.M.S., are in violation of the freedom of expression and speech guaranteed by the First Amendment to the United States Constitution and Article I, Section 8 of the Missouri Constitution, and are unconstitutional.

"9. Section 130.070.1, V.A.M.S., violates equal protection rights guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, Section 2 of the Missouri Constitution, and is therefore unconstitutional.

"10. Those sections of the Act not declared unconstitutional herein cannot stand alone, are unenforceable and unworkable to

accomplish the intent of the Initiative Petition and the Act, and the entire Act is unconstitutional, invalid and void. Relief requested by plaintiffs in Count II of plaintiffs's (sic) Petition is hereby granted.

"11. Sections 129.070, 129.075, 129.100, 129.110, 129.120, 129.130, 129.140, 129.150, 129.160, 129.170, 129.180, 129.190, 129.200, 129.210, 129.220, 129.240, 129.250, 129.260, 129.270, R.S.Mo. 1969, and Section 129.230, R.S.Mo. Sub. 1973, repealed by enactment of this Act, are hereby reinstated and declared to be the existing law of the State of Missouri.

"12. Plaintiffs are excused from complying with any and all provisions of Chapter 130, V.A.M.S., and defendants are all, and each of them, personally enjoined from enforcing, administrating, investigating, or in any way compelling compliance with said chapter and from instituting criminal prosecuting or civil proceeding to compel compliance with the Act."

The Act which is being challenged was passed by the voters of Missouri in 1974 by way of the initiative process. It contains a comprehensive scheme for the regulation of campaign finances and disclosure. The circuit court held that the entire Act was unconstitutional as to all public offices created by the constitution because the Act was in effect a constitutional amendment which did not follow the appropriate procedure set forth in art. III, sec. 50, Mo.Const., dealing with the scope and title of initiative petitions for constitutional amendments. LEPCI asserts, however, that the entire Act is unconstitutional as to all offices regardless of whether they are constitutional offices because art. VII, sec. 8, Mo.Const., provides minimal qualifications for all public offices in this state and this Act proposed to amend this constitutional provision.

■ Contrary to what either LEPCI asserts or what the circuit court concluded, this Act was not a proposed constitutional amendment and, therefore, any reliance on art. III, sec. 50, Mo.Const., is improper. The Act instead is merely a statute passed by the initiative process repealing certain statutes while at the same time enacting new statutes. The Act never purported to be a constitutional amendment and the court will not consider it as such. As a statute, the Act must, therefore, be judged on the same basis as any statute passed by the legislature regardless of the fact that it was enacted by way of the initiative process.

■ It is a basic principle of constitutional law that when a statute conflicts with a provision in the constitution the statute must give way. The court must, therefore, determine whether the entire Act conflicts with art. IV, secs. 3, 10, and 13 (qualifications for governor, lieutenant governor, and state auditor), art. V, sec. 25 (qualifications for supreme court judges, appellate court judges, circuit court judges, and judges of the probate and magistrate courts), art. VII, sec. 8 (general qualifications for all public offices).

■ In deciding this issue it is necessary to deal with offices created by arts. IV and V first because they create constitutional offices and then separately deal with art. VII, sec. 8. It is quite generally considered that where the constitution lays down specific eligibility requirements for a particular constitutional office the constitutional specification in that regard is exclusive, and the legislature (except where expressly authorized to do so) has no power to require additional or different qualifications for such constitutional office. *Whitney v. Bolin*, 85 Ariz. 44, 330 P.2d 1003, 1005 (1958). See also Annotation 34 A.L.R.2d at 171 and cases cited therein, and *Kirby v. Nolte*, 349 Mo. 1015, 164 S.W.2d 1 (banc 1942), where by implication this court held that the legislature could not by statute change the qualification for a constitutional office.

Having decided that additional statutory qualifications for a constitutional office would be invalid, it is necessary to determine whether this Act does impose additional qualifications.

Although the Missouri constitution speaks in terms of qualifications for offices, the cases usually refer to these constitution-

al requirements as eligibility requirements rather than qualifications. The word "eligibility" will be used to refer to the constitutional requirements and the word "qualification" to mean something which would not contravene the constitution.

The difference between an eligibility requirement and a qualification requirement has been confused by the cases and, even when they are defined, the difference may appear to be both academic and esoteric. The more easily understandable definitions and the ones the court adopts for the purposes of this opinion are contained in *State ex rel. Elliott v. Bemenderfer,* 96 Ind. 374 (1884). The Indiana Supreme Court said at 376: "Eligible means capable of being chosen; while qualified means the performance of the acts which the person chosen is required to perform before he can enter into office. *Searcy v. Grow,* 15 Cal. 117. Abbott, in defining the word 'qualify,' says: 'It means to take the oath and give the bond required by law from an administrator, executor, public officer or the like, before he may enter on the discharge of his duties.' L.Dict. In *Steinback v. State, ex rel.,* 38 Ind. 483, it was said: 'The term qualified was not used in its ordinary or popular signification, as possessed of endowments or accomplishments, or intellectual capacity, or moral worth to discharge the duties of an office, but the framers of the Constitution intended thereby that a person who had been elected to an office, and had taken the oath of office, and given bond, where a bond is required, was qualified and had the right to assume and discharge the duties of such office.' "

■ LEPCI contends that secs. 130.035.1, 130.035.3 and 130.070(1), purport to amend the minimum eligibility requirements for constitutional offices and are, therefore, unconstitutional. Sec. 130.035.1 establishes disclosure requirements; sec. 130.035.3 provides that a certificate of election shall not be issued to a candidate who fails to make the proper disclosures; and sec. 130.070(1) voids an election where violations of the Act occur, or if it is impossible to hold a special election prohibits the guilty candidate from becoming a candidate for any public office for ten years. Although there is some conflict in the cases of other jurisdictions concerning this matter, it is our opinion that the disclosure requirements and sanctions applicable to them, with the exception of the ten-year disability provided for in sec. 130.070(1), do not constitute additional eligibility requirements and, therefore, are not violative of the constitution of Missouri. *Secretary of State v. McGucken,* 244 Md. 70, 222 A.2d 693 (1966); *Coutremarsh v. Metcalf,* 87 N.H. 127, 175 A. 173 (1934); *Maloney v. Kirk,* 212 So.2d 609 (Fla.1968) (dissenting opinion of Drew, J.); *State ex rel. LaFollette v. Kohler,* 200 Wis. 518, 228 N.W. 895 (1930).

In *Secretary of State v. McGucken, supra,* the court upheld the withholding of a certificate of election from a candidate for a violation of a provision of the Corrupt Practices Act requiring candidates for office to appoint a campaign treasurer. The court stated at 222 A.2d 695: ". . . [I]t is obvious that the statute, which is a part of the Corrupt Practices Act, was intended to do no more than enhance the effectiveness of those regulations requiring a full disclosure of the financial aspects of the campaign of a candidate for office. Clearly the Act, including sec. 213(a) thereof, has no bearing on the eligibility of a candidate for office."

Missouri's own Corrupt Practices Act, sec. 129.010 et seq., RSMo 1969, was upheld as constitutional in *State ex rel. Crow v. Towns,* 153 Mo. 91, 54 S.W. 552 (1899), although the validity of its disclosure requirements were not at issue.

*State ex rel. Palagi v. Regan,* 113 Mont. 343, 126 P.2d 818 (1942), is a case wherein the relator Palagi sought a writ of mandamus to compel the respondent, a county clerk, to file his petition as a candidate for nomination to the office of county sheriff at the primary election to be held in July 1942. The respondent had refused to accept the nominating petition on the sole ground that Palagi was elected sheriff of Cascade County in 1938 for a term of four years, ending January 4, 1943, and was removed

from office for violation of the Montana Corrupt Practices Act. The Montana Corrupt Practices Act prohibited a person who had been guilty of violating the Act from being elected or appointed to any public office under the laws of Montana or any municipality therein for the period fixed by law as the term for the office from which he was ousted. In *Palagi's* case—four years. It declared any such appointment or election void. The Montana Supreme Court held that the statutory provision prohibiting a person who had violated the Montana Corrupt Practices Act from being subsequently elected to any public office for the period of the term of the office to which he had been first elected was unconstitutional. The reason it was unconstitutional is that it constituted an additional qualification or disqualification to those qualifications or disqualifications set forth in the constitution of Montana. The court ordered the relator's name to be placed on the ballot. The Montana Corrupt Practices Act was, like the instant Missouri law, enacted by the initiative process. While holding that there existed a legislative power to enact a Corrupt Practices Act, the court found at 825: "There can be no question that it provides a disqualification or ineligibility in addition to those provided by the Constitution. The fact that the disability is temporary and not permanent makes it no less a disqualification or ineligibility while it continues, and thus no less in conflict with the Constitution."

The same result was reached in a two-year disqualification in *State v. Carrigan*, 82 N.J.L. 225, 82 A. 524 (1912).

▪ The court holds that the provision of sec. 130.070(1) which prohibits a candidate who has wilfully violated the Act the right from being a candidate for any office for ten years following such violation *is* an eligibility requirement. As such, this requirement is unconstitutional with respect to all offices where the eligibility requirements to hold the same are set forth affirmatively in the constitution of Missouri.

LEPCI also contends that the ten-year disqualification provision of sec. 130.070(1)

is violative of art. VII, sec. 8, Mo.Const., which applies to candidates for all public offices including those offices where the qualifications are set by statute rather than by the constitution. Art. VII, sec. 8, provides: "No person shall be elected or appointed to any civil or military office in this state who is not a citizen of the United States, and who shall not have resided in this state one year next preceding his election or appointment, except that the residence in this state shall not be necessary in cases of appointment to administrative positions requiring technical or specialized skill or knowledge."

▪ As noted supra, the ten-year disqualification provision is unconstitutional with respect to those offices for which the candidate's qualifications are affirmatively set forth in the constitution. However, art. VII, sec. 8, does not prohibit the legislature from adding additional qualifications or eligibility requirements as to those offices for which the eligibility requirements or qualifications are set by statute. The court, therefore, holds that the provisions of secs. 130.035.1 and 130.035.3 and 130.070(1) are not violative of art. VII, sec. 8.

LEPCI challenges the various expenditure provisions of the Act on First Amendment grounds. The United States Supreme Court had occasion to consider the constitutionality of the Federal Election Campaign Act (hereinafter the Federal Act), 2 U.S.C., sec. 431 et seq., in *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). The Federal Act parallels the Missouri Campaign Finance and Disclosure Act in many respects. Briefly put, the court in *Buckley* upheld the Federal Act's individual contribution limits and disclosure provisions but found limitations on campaign expenditures, on expenditures by individuals and groups outside the framework of an organized political campaign, and on expenditures by a candidate from his personal funds in conflict with the First Amendment.

▪ Before the Act can be analyzed according to the precepts enunciated in *Buckley,* special scrutiny is required of sec.

130.010(4). It is a well-settled rule of law that the legislature's own construction of its language by means of definition of the terms employed should be followed in the interpretation of the statute to which it relates and is intended to apply and supersedes the commonly accepted dictionary or judicial definition and is binding on the courts. *In re Estate of Hough,* 457 S.W.2d 687 (Mo.1970). Sec. 130.010(4) suffers from the misfortune of using one definition to define the words "contribute", "contribution", "expend", and "expenditure". It would seem that the import of so defining the terms is that they were intended to mean the same thing. This being so, the Act must be read as though the defined terms were interchangeable.

▪ The court finds the following sections of the Act unconstitutional because they abridge protected First Amendment rights as incorporated by the Fourteenth Amendment: sec. 130.015.1 (limit on expenditures by a candidate or political committee supporting such candidate for statewide public office); sec. 130.015.2 (limit on expenditures by a candidate or political committee supporting such candidate for any other public office); sec. 130.015.5 (limitation on expenditures by committees whose expenditures are attributable to a candidate); sec. 130.020.7 (limitation on expenditures by a candidate or member of his immediate family); sec. 130.020.8 (although this section speaks of limiting contributions by a person to a candidate and by a person to all candidates, by definition it also limits expenditures so that it would include independent expenditures in support of candidates); sec. 130.025.5 (limitation on expenditures by political committees); and sec. 130.025.7 (attributing certain advertising expenditures to candidates on a pro rata basis and thereby limiting expenditures).

These sections can be grouped into three categories based on the holdings in *Buckley.* The first category includes those sections which place limits on independent expenditures outside the framework of an organized campaign but advocating the election or defeat of a clearly identified candidate.

The U.S. Supreme Court found such limitations unconstitutional at 424 U.S. 39–51, 96 S.Ct. 612. Within this category fall secs. 130.025.5, 130.025.7 and 130.020.8. The first two sections can place a ceiling on independent expenditures by attributing them to a particular candidate. Expenditures may be attributed to a candidate only if they are authorized or requested by the candidate, in which case the expenditure is treated as an expenditure by the candidate and a contribution by the person or group making the expenditure. See 424 U.S. 46, note 53, 96 S.Ct. 612. Sec. 130.020.8, when construed in light of the definition in sec. 130.010(4), limits independent expenditures by a person other than a candidate.

The second category includes any limit on expenditures by candidates from personal or family resources. The United States Supreme Court found such a restriction unconstitutional at 424 U.S. 51–54, 96 S.Ct. 612. Within this category falls sec. 130.020.7.

The third and final category established by *Buckley* includes limits on the total amount of money that may be expended on behalf of a candidate. 424 U.S. 54–59, 96 S.Ct. 612. This category includes secs. 130.-015.1–.2 and .5.

▪ Additionally, LEPCI contends that sec. 130.010(4) violates the due process clause of Amendment 14, U.S.Const., and art. I, sec. 10, Mo.Const., on the grounds that the definitions set forth therein are vague and ambiguous. It must be borne in mind that under sec. 130.075.1 a violation of any provision of the Act warrants the imposition of criminal penalties of fines up to $5,000 and/or one-year's confinement in jail. The fatal flaw alleged to exist in sec. 130.010(4) is that it attempts to define "contribute" and "contribution" with "expend" and "expenditure" using the same definitions. Generally, the legislature may define its terms as it wishes. *In re Estate of Hough, supra.* Of course, the fact that the Act was passed by initiative process does not change the rule. In the instant case, however, we must remember that limits on campaign expenditures are unconstitutional. *Buckley, supra.* In light of this, it

becomes necessary to ask the question: What is an expenditure, what is a contribution, and how do they differ? This, sec. 130.010(4) does not answer. As the Supreme Court of the United States stated in *Buckley* at 77, 96 S.Ct. at 662:

 "Due process requires that a criminal statute provide adequate notice to a person of ordinary intelligence that his contemplated conduct is illegal, for 'no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.' *United States v. Harriss*, 347 U.S. [612], at 617, 74 S.Ct. [808], at 812 [98 L.Ed. 989]. See also *Papachristou v. Jacksonville*, 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972). Where First Amendment rights are involved, an even 'greater degree of specificity' is required. *Smith v. Goguen*, 415 U.S. 566, 573, 94 S.Ct. 1242, 1247, 39 L.Ed.2d 605 (1974). See *Grayned v. Rockford*, 408 U.S. 104, 109, 92 S.Ct. 2294, 2299, 33 L.Ed.2d 222 (1972); *Kunz v. New York*, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951)."

Unlike the court in *Buckley*, we are not determining the scope of one phrase not heretofore defined. Here, we are attempting to dissect from a single definition two terms which, for constitutional purposes, are radically different, to wit, limits on expenditures are unconstitutional while some limits on contributions are not. *Buckley, supra.* This simply cannot be done with any degree of certainty. Indeed, it is impossible to determine which part of the definition is related to "expenditures" and which part is related to "contributions".

 The court holds that sec. 130.010(4) is so ambiguous and vague that it fails to provide the adequate notice to a person of ordinary intelligence as to whether his contemplated conduct with respect to political contributions and expenditures is illegal in view of *Buckley, supra.* For these reasons, sec. 130.010(4) does not meet constitutional standards.

As noted supra, sec. 130.070(1) punishes one successful candidate who wilfully violates any provision of the Act with a ten-year prohibition against being a candidate for any public office (where a special election after removal cannot be held), but another like candidate, if the office *can* be filled by a special election, suffers no disenfranchisement at all. LEPCI contended that sec. 130.070(1) violated the equal protection provisions of Amendment Fourteen, U.S.Const., and art. I, sec. 2, Mo.Const. The lower court declared sec. 130.070(1) unconstitutional because it establishes two classifications of violators of the Act with different punishments. It found that such a classification was in violation of the Fourteenth Amendment of the U.S.Const., and art. I, sec. 2, of the Mo.Const. Sec. 130.070(1) basically provides that, if the particular office involved is one for which the governor is authorized to call a special election, the violator's election will be declared void and such election will be held. Where the office involved is one for which the governor is not authorized to call a special election, the violator will be denied the right to be a candidate for public office for ten years.

 In deciding whether particular legislation violates the equal protection clause, two different avenues may be taken. If the legislation touches "fundamental rights" or involves a "suspect class" in need of special protection, the courts must strictly scrutinize the legislation. *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 312, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976). If not, the legislation will be struck down only if it is not rationally related to some legitimate state interest. *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 813–814, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976). Unfortunately the right of a person to seek public office is one of the nebulous areas where strict scrutiny is sometimes applied and sometimes not. *Bullock v. Carter*, 405 U.S. 134, 143, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972). State and federal cases following *Bullock* have not been consistent in determining if a fundamental right was involved. *Cahnmann v. Eckerty*, 40 Ill.App.3d 180, 351 N.E.2d 580 (1976), cites *Bullock* for the proposition that the right to candidacy is not a fundamental right, while *Mancuso v. Taft*, 476 F.2d 187

(1st Cir. 1973), found the right to candidacy a fundamental right relying on *Bullock* and the First Amendment. Recently, the U. S. District Court for the Western District of Missouri applied the strict scrutiny test to invalidate Missouri statutes restricting the freedom to run for office. In *McCarthy v. Kirkpatrick*, 420 F.Supp. 366 (W.D.Mo. 1976), the court found Missouri statutes requiring independent candidates to file petitions 188 days before the general election when party candidates did not have to file until July or August placed an impermissible burden on the First Amendment rights of the candidates and those who wished to support them and denied the candidates equal protection under the law. The court also held that a statute requiring independents to have the name of their presidential electors on the ballot when party candidates could have their names appear denied the candidates equal protection. As *Bullock*, 405 U.S. at 143, 92 S.Ct. 849, *Mancuso* at 193, and *McCarthy* at 372, all recognized, a limitation on the right to be a candidate has at least an indirect impact on one of the most basic fundamental rights—the right to vote. *Williams v. Rhodes*, 393 U.S. 23, 31, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968).

■ LEPCI does not attack the government's power to bar a candidate from office for violation of its campaign laws. Its argument is that in barring some office holders and not others, the equal protection clause is breached. Sec. 130.070(1) substantially infringes on the right of some candidates to seek public office, not because of the degree or seriousness of their violation of the Act, but simply as a result of the particular office they have chosen to seek. In *Bullock* the court held a law denying the right to run for office because of wealth required strict scrutiny; we hold a law denying the right to run for public office based on the particular office sought also requires strict scrutiny. A ten-year limitation on the right to run for public office has a real and appreciable impact on the right to vote by denying the electorate of a possible candidate for an appreciable period of time; it infringes on the candidate's freedoms of expression and association; and it discriminates against such candidates by allowing other candidates for other offices who have committed the same or similar offenses the right to continue to be candidates for public office.

■ Having determined that the strict scrutiny test is to be applied, it is necessary for the government to show a "compelling interest" in the classification. *Shapiro v. Thompson*, 394 U.S. 618, 634, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). The attorney general urges that because there is no authority to hold special elections for some public offices, these offices would be left vacant if voiding an election would be the government's only recourse for a violation of the Act, and this would be of little or no benefit to the public, but he does not identify such offices. Art. IV, sec. 4, Mo.Const., provides that the governor shall fill all vacancies in public offices unless otherwise provided by law. Few offices if any (other than the lieutenant governor) would remain vacant in Missouri. This discrepancy, however, does not further any discernible legitimate purpose of the Act. Sec. 130.070(1) fails to use the nature and severity of the offense as the grounds for the uneven sanctions which result merely because the office the violator has sought happens to be one for which a special election cannot be called. The classification is arbitrary and unreasonable and does not further the purpose of the Act which is to insure the integrity of the electoral process. We find sec. 130.070(1) in violation of the Fourteenth Amendment, U.S.Const., and art. I, sec. 2, Mo.Const. We also note that no claim was made under art. I, sec. 25, Mo.Const., which provides that elections shall be "free and open". See *Preisler v. City of St. Louis*, 322 S.W.2d 748 (Mo.1959), where it was said at 753, that "every eligible person has a right under the constitutional guarantee of free and open elections to become a candidate for office."

LEPCI raises numerous objections to sec. 130.020.5 of the Act. That section prohibits certain entities, including labor organizations, from making contributions or expenditures in an election. 2 U.S.C., sec. 441b,

and its predecessor 18 U.S.C., sec. 610, contain similar restrictions on the contributions or expenditures of corporations or labor organizations in an election at which federal officers are elected or nominated. Those provisions have consistently been upheld against contentions that they denied equal protection of the law or infringed on protected First Amendment rights. *United States v. Pipefitters Local Union*, 434 F.2d 1116 (8th Cir. 1970), adhered to 434 F.2d 1127 (1970), rev'd on other grounds 407 U.S. 385, 92 S.Ct. 2247, 33 L.Ed.2d 11 (1972); *United States v. First National Bank of Cincinnati*, 329 F.Supp. 1251 (S.D.Ohio 1971); *United States v. Boyle*, 157 U.S.App. D.C. 166, 482 F.2d 755 (1973), cert. denied 414 U.S. 1076, 94 S.Ct. 593, 38 L.Ed.2d 483 (1973); *United States v. Chestnut*, 394 F.Supp. 581 (S.D.N.Y.1975), aff'd, 533 F.2d 40 (2d Cir. 1976); *United States v. Clifford*, 409 F.Supp. 1070 (E.D.N.Y.1976).

■ As pointed out in *Boyle*, 157 U.S. App.D.C. at 174, 482 F.2d at 763, there are two purposes for a statute such as sec. 130.020.5. The first is to assure that any money used by the entity for political expenditures is segregated. The second is to assure that a dissenting union member is not forced to contribute to support political views with which he disagrees. Both purposes serve legitimate state interests in preserving the integrity of the ballot box by preventing corporate and union officials from using general union dues to promote political parties and candidates without the consent of stockholders or union members with different political views, and by protecting individuals who may refuse to contribute to campaign funds against reprisals. See also *United States v. Chestnut, supra*, at 590. Although the statute may limit to a small extent freedom of association and discriminate against corporations, labor unions, and bank and trust companies, it is neither overbroad nor unreasonable. In light of the authorities cited supra and the substantial government interest involved, we hold sec. 130.020.5 not to be in violation of the United States or Missouri constitutions.

■ LEPCI also attacks sec. 130.020.5 on the grounds that it touches areas in which the United States Congress is supreme. LEPCI has cited no cases, and we are unable to find any, which hold contributions of union funds to political candidates to be a "concerted activity" protected by 29 U.S.C., sec. 157. The statute in question here does not deal with wages, hours, or other terms and conditions of employment. The court holds that the political activity of unions in state and local elections has not been pre-empted by federal legislation. The point is overruled.

LEPCI contends that sec. 130.035.1(5) and (6) are overbroad and violate constitutionally protected privacy rights under Amendments One, Four, Nine, and Fourteen, U.S. Const. In *Chamberlin v. Missouri Elections Com'n*, 540 S.W.2d 876 (Mo. banc 1976), the point was raised but not decided as the court restricted the opinion there to the specific facts presented in that case. This is a broader declaratory judgment action than was *Chamberlin* and the issue will be decided in this case.

The scope of the reporting requirements of income and the identification of sources, such as customers, clients, and patients, under sec. 130.035.1(5) and (6) have been set forth in *Chamberlin* and need not be further detailed here. We have considered the cases cited by defendants but believe that *City of Carmel-By-The Sea v. Young*, 2 Cal.3d 259, 85 Cal.Rptr. 1, 466 P.2d 225 (1970), and *County of Nevada v. MacMillen*, 11 Cal.3d 662, 114 Cal.Rptr. 345, 522 P.2d 1345 (1974), are most persuasive, both of which appear in *Chamberlin* at 883.

Neither here nor in *Chamberlin* have the parties who have defended the Act shown the important governmental interest, if any, the protection of which necessitates the all-pervasive reporting requirements of these two sections. These reporting requirements were not upheld in *Chamberlin* but rather the adjudication of the validity was put off to another day and another case.

■ The court holds that the requirements of sec. 130.035.1(5) and (6), whereby the source by individual name and address of income and gifts to the candidate, his spouse, or minor children, of over $100 or $500 over a twelve-month period is, on the record of this case, an unconstitutional invasion of the privacy of the candidates and their customers, clients and patients.

Having decided the merits of LEPCI's attacks upon the Act, we must now consider whether the Act may still stand without those sections we have found in violation of the United States of Missouri constitutions. Sec. 130.085 contains the Act's "severability clause". However, this section has little import because sec. 1.140, RSMo 1969, provides that all statutes are severable. That section reads: "The provisions of every statute are severable. If any provision of a statute is found by a court of competent jurisdiction to be unconstitutional, the remaining provisions of the statute are valid unless the court finds the valid provisions of the statute are so essentially and inseparably connected with, and so dependent upon, the void provision that it cannot be presumed the legislature would have enacted the valid provisions without the void one; or unless the court finds that the valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent."

In *State ex rel. Enright v. Connett*, 475 S.W.2d 78 (Mo. banc 1972), the court examined the doctrine of severability as it exists in Missouri. Quoting from *State ex rel. Audrain County v. Hackmann*, 275 Mo. 534, 205 S.W. 12, 14 (banc 1918), the court stated at 81: "The test of the right to uphold a law, some portions of which may be invalid, is whether or not in so doing, after separating that which is invalid, a law in all respects complete and susceptible of constitutional enforcement is left, which the Legislature would have enacted if it had known that the exscinded portions were invalid."

The *Enright* court also quoted from *State ex rel. Harvey v. Wright*, 251 Mo. 325, 158 S.W. 823 (1913): "We cannot state the rule better or more briefly. We might state it

in different language by saying that if, after cutting out and throwing away the bad parts of a statute, enough remains which is good to clearly show the legislative intent, and to furnish sufficient details of a working plan by which that intention may be made effectual, then we ought not, as a matter of law, to declare the whole statute bad. Cooley on Con. Lim. (7th Ed.) 247; *State ex rel. [Tolerton] v. Gordon*, 236 Mo. [142], loc. cit. 171, 139 S.W. 403; *State ex rel. [Applegate] v. Taylor*, 224 Mo. [393], loc. cit. 474, 123 S.W. 892; *State v. Bockstruck*, 136 Mo. 335, 38 S.W. 317." 475 S.W.2d at 82.

■ The court has held supra that all of the expenditure limitations, part of the penalty provisions, and the section defining "contribution" and "expenditure" are invalid for the reasons set forth. These sections pertain to essential elements of the Act. Of particular significance is sec. 130.010(4), for without an adequate definition the Act becomes ambiguous and uncertain in its enforcement. When we look to "what is left", we cannot find an act which is "complete and susceptible of constitutional enforcement", *Enright, supra*, at 81, nor do we find "sufficient details of a working plan", *Enright* at 82. The remainder of the Act is so dependent on the definitions in sec. 130.010(4), and they are so intertwined with the remainder that the remainder of the Act cannot stand alone. Those sections remaining cannot be enforced according to the intent expressed by the people in their initiative petition and, therefore, the court holds that the entire Act is invalid and void.

■ Finally, we find the trial court properly denied fees for LEPCI's attorneys. Sec. 527.100, RSMo 1969, provides for costs to be awarded as the court may find equitable and just. "Costs" has been interpreted to include attorneys' fees. *Bernheimer v. First National Bank of Kansas City*, 359 Mo. 1119, 225 S.W.2d 745, 755 (banc 1949). However, "costs" are not assessible against the state. *Automagic Vendors, Inc. v. Morris*, 386 S.W.2d 897, 900 (Mo. banc 1965).

The judgment is affirmed.

Opinion modified on court's own motion.

MORGAN, C. J., and HENLEY and DONNELLY, JJ., concur.

RENDLEN, J., withdraws concurrence and dissents in separate opinion filed.

FINCH, J., withdraws concurrence and concurs in dissenting opinion of REND-LEN, J.

SEILER, J., withdraws his opinion concurring in part and dissenting in part and concurs in dissenting opinion of REND-LEN, J.

RENDLEN, Judge, dissenting.

On reconsideration of the majority opinion, I have determined that valuable portions of the Election Campaign Expenditures Act remain viable and furnish a workable statutory scheme, readily severable from those sections otherwise struck down. In this effort, able assistance was furnished by numerous suggestions from various sources filed in support of the motions for rehearing. For the reasons following, I respectfully dissent.

Analysis of "live"[1] portions of the Act (Chapter 130, RSMo Supp.1974) reveals they in large measure fulfill the plan adopted by an overwhelming majority (more than 70%)

**1.** For convenient reference, the expressions "live" or "viable" sections (or similar terms) when employed in this dissent, refer to those sections nullified only by the majority's application of a concept of *non*-severability. The expression "stricken sections" (or similar terms) refers to those sections found unconstitutional for reasons *other than* non-severability.

**2.** Section 130.085: *Severability Clause*—"If any provision of sections 130.010 to 130.085 or the application thereof to any person or circumstances is held invalid, the invalidity shall not affect other provisions or applications of sections 130.010 to 130.085 *which can be given effect* without the invalid provision or application, and to this end the provisions of sections 130.010 to 130.085 *are declared severable.*" (Emphasis supplied.)

**3.** The 18 sections stricken by the majority, for reasons other than non-severability, deal only with: (1) The *spending ceilings* of the Act, which were nullified by application of the ruling by the United States Supreme Court in *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), and (2) The much criticized subparagraphs 130.035.1(5) and (6), which

of the voters in the 1974 Initiative Election. Clearly it was intended that if partial nullification occurred, portions of the Act remaining were to be severed and retained. This clear intention to save the Act is found in the severability clause[2] and in the independent nature of the Act's enforceable features.

Though the majority has struck that part pertaining to *ceilings on spending limits* and the disclosure requirement as to candidates' *personal income*,[3] four additional features or parts of the plan for election control remain essentially unscathed. These contain the heart and central theme of the Law, i.e., the *strict accounting* and *public reporting* of political monies by candidates and committees.

The four additional identifiable features of the Act, though interrelated, are independent. They (together with the stricken portion) are: I. Candidates and political committees must *strictly account* for all political monies received and expended. II. Public disclosure of such accounts are required *before, during* and *after* a campaign. III. Important new constraints on the political spending practices of corporations,

dealt solely with the requirement that candidates must report their sources of *personal income*. These subparagraphs were stricken as constitutionally impermissible invasions of privacy. It should be specially emphasized that these requirements for reporting sources of *personal income* were separate and apart from the reporting requirements as to *political contributions* received by the candidate. The latter feature remains.

In *Chamberlin v. Missouri Elections Commission*, 540 S.W.2d 876 (Mo.banc 1976), this court upheld § 130.035.1(5) and (6) as facially valid, and rejected the constitutional challenge made to those sections. This because petitioner's "claim of harm" was "highly speculative" and failed for want of proof to justify "the claim of anticipated harm and unconstitutional application." l.c. 881. The record in the case at bar is weaker than that in *Chamberlin*. Petitioner here failed to present any facts of probative value showing harm. Its position is less than "highly speculative", it is "completely speculative". Yet the court, without regard to its decision in *Chamberlin* reverses its stance on the issue.

banks, trust companies and labor organizations. IV. Establishment of a "Missouri Elections Commission" with statewide regulatory, rule making, investigative and enforcement powers. V. Spending ceilings on candidates and their committees, declared invalid by the majority under *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).

I cannot agree with the sweeping conclusion of the majority that in the four "live" parts (listed first above) "we cannot find an act which is complete and susceptible of constitutional enforcement." In fulfilling our duty to harmonize and where possible identify workable portions as expressions of the people's will, much that remains is "complete and susceptible to constitutional enforcement . . . which the (people) would have enacted if (they) had known that the exscinded portions were invalid." *State ex rel. Enright v. Connett*, 475 S.W.2d 78 at 81 (Mo.banc 1972). This conclusion is reached by application of the time honored rule: "when the unconstitutional portion is stricken out, [if] that which remains is complete in itself and capable of being executed in accordance with the apparent legislative intent, wholly independent of that which was rejected, *it must be sustained.*" (Emphasis added.) *Household Finance Corporation v. Shaffner*, 356 Mo. 808, 203 S.W.2d 734, 737 (banc 1947).

### THE SEVERABILITY ISSUE

Adopted through the initiative process, the Act was arranged by the reviser of statutes in 16 sections. Those sections contain 95 subsections plus 45 paragraphs totaling 140 parts, of that number only 18 were stricken by the majority for reasons

other than non-severability. Qualitatively and quantitatively a substantial workable basis (more than 85%) of this sorely needed election control plan remains.

To point up the broad range and workable quality of the Act's "remaining" sections, I now examine its several features.[4]

### FEATURE I

### STRICT ACCOUNTING PRACTICES REQUIRED OF CANDIDATES & COMMITTEES

*Section 130.020* contains eight subsections with several paragraphs which remain intact.[5] Many valuable aspects of the law, warranting retention are found in this section. They deal with collection and distribution of anonymous contributions, and safeguards against abuses in this area of campaign financing. This section also provides for disclosure of *indirect* contributions and requires that cash contributions in the amount of $50 or more from an *individual* be accompanied by contribution statements on forms approved by the Commission. Further, no candidate may accept a contribution from a *political committee* of more than $100 unless the contribution is accompanied by a written statement setting forth the full name and address of each person who has contributed more than $25 of the contribution.

*Section 130.025*—Subsections 1, 2, 3, 4 and 6 (subsection 5 was otherwise invalidated) provide comprehensive control requirements essential for the financial reporting process by political committees. Committees must appoint a treasurer who shall properly account or be *removed* and no contributions are to be received until (1) the

---

4. The first section of the Act, § 130.010, contains 11 numbered subsections and seven paragraphs defining the terms, appropriate officer, candidate, commission, immediate family, labor organization, official committee, person, political committee, political committee treasurer or committee treasurer, and public office or office.

 Subsection 130.010[4], stricken by the majority for "vagueness" is not a true definition section, and was inappropriately included in the definition section. This will hereinafter be discussed in detail. Notwithstanding the ma-

jority's ruling as to subsection 4, ten other important subsections of 130.010 remain whole.

5. Only subsections 7 and 8 relative to spending limits as to a candidate, his family or political committee in subsections 7 and 8 are voided. Subsection 9, though not mentioned by the majority opinion, provides penalties for violations of subsections 7 and 8, and is rendered ineffective by their nullification.

name and address of the treasurer, (2) the names of candidate or candidates it supports or opposes and (3) the name and address of the bank it will use as a depository are certified to the "appropriate officer." As a further control device, no contributions or expenditures shall be made except through the treasurer. Subsection 6 controls the candidate utilization of more than one committee to support his candidacy. These and related sections provide important restraints to prevent recurrence of well known abuses in the Missouri election process. These safeguards against sub-rosa routing of political monies should be retained.

*Section 130.030—Records and accounts required—Commission may inspect.* This section, coupled with § 130.035 (the reporting section), and § 130.045 (time for filing reports) are keys to the statutory scheme. The section contains six subsections (with several paragraphs) requiring that each candidate and political committee maintain records and accounts, lists of contributions, information showing whether the contributor is a member of the immediate family, names and addresses of persons to whom amounts were paid or promised, and listings of all anonymous contributions received (including those accepted, those returned to the donor and those transmitted to the state treasurer). This section also requires the candidate to notify the appropriate officer of the name and the address of the depository where the monies received from contributions are to be kept, and that all contributions must be deposited in a *named* bank and campaign accounts must be current within ten days.

Power is vested in the Commission to promulgate rules and regulations as to bookkeeping procedures. All records of contributions and expenditures shall be kept for at least two years following the election or after the last supplemental statement filed and, on written demand of the Commission, a candidate or a treasurer

shall retain such records until an audit has been completed by the Commission. The treasurer is responsible for the committee's compliance with the requirements of the section. This designated officer is raised to a level of responsibility and accountability under the law which provides a focal point for control. The majority opinion offers no explanation or acceptable rationale for holding these sections do not constitute a severable working plan.

## FEATURE II

### A—CANDIDATES AND COMMITTEES REQUIRED TO PUBLICLY *DISCLOSE* AND *REPORT* CONTRIBUTIONS AND EXPENDITURES

*Section 130.035* relates to candidates filing financial reports and the contents of those reports. This is an indispensable feature of any meaningful election reform act. It requires that every *candidate* sign and file sworn written *reports* (at the times prescribed in section 130.045) setting forth contributions received and expenditures made by the candidate while endeavoring to secure a nomination or election. Those reports must include: (1) All contributions, including transfer of funds from previous campaigns with the names and addresses of contributors, the amount contributed, and the dates the contributions were received. (Those contributing in the aggregate less than $25 need not be listed, but instead "may be grouped as one item and so identified.") (2) All expenditures made by the candidates and the names and addresses of the persons to whom the amounts were paid or promised. (3) All anonymous contributions which were transmitted to the state treasurer, the amount of each such contribution and the date transmitted. (4) Any business or investment exceeding $1,000 in value.[6]

*Political committees* are similarly required to report and penalties are provided for non-compliance.

---

6. Subparagraphs 1(5) and 1(6) relating to reporting of the sources of *personal income* were stricken, as discussed *supra,* for a reason other than non-severability. The removal of these much criticized subsections does not affect the efficacy of the plan incorporated in the other subsections of 130.035.

*Section 130.040* prescribes exemptions from reporting contributions and expenditures for any candidate (or political committee) who "does not in the aggregate receive more than $500 for any election" and who files the necessary exemption affidavit. See *Missourians for Honest Elections v. Missouri Elections Commission,* 536 S.W.2d 766 (Mo.App.1976).

## B—TIME FOR FILING REPORTS

*Section 130.045* specifies the following times for filing financial reports: *First* not later than *40 days before* the date of election; *second* not later than *7 days before* said date and *third,* a report *30 days after* an election. The period to be reported commences early (i.e., from the date a person "became a candidate", § 130.045.2) and continues through the election. From this broad system of public reporting, the electorate may make timely candidate evaluations by examining the pre-election financial reports.[7] This stands in marked contrast with the old law (section 129.230, RSMo 1969), which requires *only* that a candidate or committee file financial reports one month *after* the election. The old system affords no opportunity for the electorate to obtain the vital information concerning the candidates prior to the time of voting. Widespread criticism of this ineffective "after-the-fact" reporting scheme led to the promulgation and adoption of § 130.045 by the initiative process in 1974. In addition, the after-the-fact reporting requirement of the old law was often circumvented by the device of *"one-man committees"*. Such one-man committees could conceal their activities because only committees of *"two men or more"* were required to report, § 129.200, RSMo 1969. *United States v. Pipe Fitters Local No. 562,* 434 F.2d 1116, 1121 (8th Cir. 1970) involved the criminal prosecution of union leaders for violating 18 U.S.C. § 602 by using union funds for political contributions. From that case we learn that more than $1,200,-000 were contributed by union members

between 1963 and 1968, to a bogus independent political fund which was actually an arm of the union. Part of the fund was contributed to candidates' campaigns for federal offices. If this had occurred in connection with state candidates' campaigns following 1974, it would have constituted a violation of § 130.020.5. Moreover, under § 130.035.2 such contributions to state political candidates must now be reported and could not be circumvented by "one man" committees, as possible under the old "Corrupt Practices Act." (Section 129.200, *supra.*) By the majority's action, the indispensable reporting provisions of Chapter 130 are lost and Missouri is thrust into the lamentable situation which led the aroused electorate to adopt Chapter 130 in 1974.

To augment the accounting and disclosure requirements of the Act, § 130.050 assigns the Secretary of State to assist the Commission in development of forms, publishing and furnishing manuals setting forth uniform bookkeeping methods, disseminating information, preserving reports, compiling statistics and with the responsibility for examining each report and statement filed in his office to determine "if the statements are properly completed and filed within the time required" by the law. The Secretary of State is further clothed with authority to report violations to the Commission.

## FEATURE III

PROHIBITIONS AGAINST CORPORATIONS, UNIONS, TRUST COMPANIES AND BANKS CONTRIBUTING DIRECTLY OR INDIRECTLY TO ANY CANDIDATE

*Section 130.020.5* prevents financial institutions and corporations from expending or contributing their earnings or assets to any candidate. Similarly, labor unions are not permitted to use its funds or the dues collected from its members for such purposes. Such constraints do not apply to *voluntary*

---

**7.** Additional comprehensive reporting requirements designed to prevent historic abuses are

prescribed by the other subsections of § 130.-045.

contributions or expenditures by individual employees or union members. This valuable safeguard for the Missouri election process is lost by the majority's denial of the principle of severability.

## FEATURE IV

### ESTABLISHMENT OF THE "MISSOURI ELECTIONS COMMISSION" WITH STATEWIDE AUTHORITY AND RULE MAKING POWERS

The "Missouri Elections Commission" is established by § 130.055 prescribing the qualifications, appointment, term, compensation, and similar features concerning its members. An executive director is to be appointed to serve at the pleasure of the Commission. Most importantly, § 130.060 vests authority in the Commission to promulgate "rules and regulations" to carry out the policies and purposes of the Act, establish procedures for handling complaints, publish advisory opinions, and bring civil actions as appropriate to control violations or threatened violations of the Act. In addition, general machinery for the operation of the Commission is provided in § 120.065.

## FEATURE V

### CANDIDATE AND COMMITTEE SPENDING CEILINGS

*Section 130.015* deals with spending "ceilings" as to candidates and political committees. The majority, applying *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), invalidated subsections 1, 2 and 5 but apparently left intact subsections 3, 4 and 6 of *§ 130.015*. However, removal of 1, 2 and 5 strips the remaining subsections of their vitality. Also stricken are those spending limits as to candidate, his family or political committee in *§ 130.020(7)* and *§ 130.020(8)* and related sections *130.025.5* and *130.025.7*. Similarly *§ 130.070(1)* was invalidated under the Fourteenth Amendment to the United States Constitution and Art. I, § 2 of the Missouri Constitution. Nullification of these sections effectively removed the limits on spending from the Act. However, the remaining features of the Act are severable and should be retained.

*Section 130.085 — Severability Clause.* It is here provided that if any section of the Act is held invalid such invalidity shall not affect other provisions of the Act "which can be given effect without the invalid provisions . . . and to this end the provisions of Section 130.010 to 130.085 are declared severable." This section can best be described as an expression of the voters intent that if specific sections are declared constitutionally infirm, the remaining portions should, if possible, be saved. From this we sense the purpose and belief of the electorate that the four features of the Act (I, II, III & IV, *supra*) can and were intended to stand alone, if V was nullified. To attain this purpose, the principal of severability should be applied. I respectfully submit that the sections of the Act discussed above which have been nullified only for want of severability, should instead be declared valid, enforceable statutes of our state.

## THE VAGUENESS ISSUE

The sections of the Act remaining after excision of the spending ceiling feature (Feature V, *supra*) contain many references to the terms *to expend* and *to contribute*. A reading of the Act, whether casual or careful, presents no difficulty arising from the use of these terms. They are used in their ordinary sense. To say, as does the majority, that they are vague and ambiguous is unjustified. The majority fails to indicate an instance of such vagueness, except through its troubled and erroneous treatment of section 130.010[4]. This misplaced reliance on the so-called "vagueness" of section 130.010[4] is the false premise underlying the majority's insistence that features I, II, III & IV be stricken.

The majority's conclusion stems from the mistaken notion that the terms *are* defined in § 130.010[4], and that the *definitions* are unacceptably vague, permitting the terms to be used interchangeably throughout the

Act. Such is not the case. The terms *to contribute* [contribution] and the term *to expend* [expenditure] are *not defined* in the subsection. A detailed line by line review reveals the terms are not defined at *any* place in the Act. While it must be conceded § 130.010[4] is placed in the "definitions" section of the Act, this does not alter the fact that the subsection [4] offers no definition of any term contained therein and is *not* a definition section. It does not define the verbs *to expend* or *to contribute* by any term describing action. A noun does not define a verb; another verb depicting *action* is required. Subsection [4] merely lists things of value which when *contributed* or *expended* bring it within the purview of the Act. Stated otherwise, if one of the things of value listed in 130.010[4] is contributed or expended, such transaction [i.e., the act of *contributing such thing* or *expending such thing*] is subject to Chapter 130, the Election Campaign Expenditures Act. The following nouns appearing in the subsection function as the object of either the act of *expending* or of *contributing* but do not define either verb. They are as follows: (1) advance, (2) conveyance, (3) deposit, (4) distribution, (5) transfer of funds, (6) payment, (7) gift, (8) pledge, (9) subscriptions of money or (10) anything of value; and they include (but are not limited to): (1) the candidate's own money or property, (2) loans, (3) cancellations of loans, (4) expenses and receipts from fund raising events, (5) purchase of advertising, (6) payment of compensation by a third party for services given to a candidate, (7) money from the sale of goods or services, (8) money from rebates or refunds, and (9) contracts to make contributions or expenditures.

In addition, some services or other objects are specifically excluded from the examples of contribution such as uncompensated services by speakers, writers or publishers, internal dissemination of information by a union, corporation or other organization to its members, shareholders or employees; "home hospitality", voluntary personal services by volunteer campaign workers; and incidental personal expenses incurred by volunteer workers. Also, expenditures by political organizations not linked to a particular candidate, for office overhead, salaries of full time staff members, purchase of office equipment, rent and other normal operating expenses are not attributed to any candidate for the purposes of the Act.

It is thus apparent that the verbs *to contribute* and *to expend* are used throughout the Act in their common and usual sense or meaning of the terms as follows:

1. *To contribute* : = to give or to lend or to furnish to a common fund or to bring about a common result.

2. *To expend* : = to pay out, to distribute, to spend, to consume by using up. See the Oxford English Dictionary, Compact Edition, Volume I. See also Webster's New World Dictionary, Second College Edition, 1974, and Webster's Third New International Dictionary, 1976.

The terms as they appear in context are readily understood. It strains credulity to say the use of these verbs render the entire statute remaining non-severable or unconstitutionally vague. I would hold those parts of the Act exclusive of § 130.035(5) and (6) and those not nullified by force of *Buckley v. Valeo, supra,* severable features of the Act.[8]

My determination that portions of the Act are severable revives a number of contentions not reached by the majority because of its invalidation of the entire Act. Those contentions challenge "live" sections of the Act on other grounds than non-severability. I have considered such contentions and find them without merit; it would, however, serve no purpose to burden this dissent with a discussion of those issues.

The majority ignores the presumption of statutory validity and does violence to the long standing principle of severability of legislative acts. The severable features of

8. In addition to those invalidated portions mentioned above, the following sections are sufficiently undercut to have lost their vitality with no remaining useful function. They have become surplusage: *130.015(3), 130.015(4), 130.015(6)* and *130.020.9.*

the Act should be preserved. For these reasons, I must respectfully dissent.